## Link's Estate (No. 1).

Argued October 5, 1934.   Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Edward G. Bothwell,* of *Morris, Walker & Bothwell,* for appellants.

*H. Stanley Douglass,* Special Deputy Attorney General, with him *John Y. Scott,* Deputy Attorney General, and *Wm. A. Schnader,* Attorney General, for appellee.

*Oliver K. Eaton,* for D. E. Sweeney, Master.

OPINION BY MR. JUSTICE KEPHART, June 29, 1935:

John H. Link was born in 1857 in Allegheny County. He died August 26, 1930, aged 73 years, unmarried, intestate, and leaving no issue. Four claimants to his estate, residing in Germany, aver they are first cousins of decedent through his father. They are known as "Link claimants." Two others living in the same country claim as first cousins through decedent's mother, Elisabetha Hoffman Link. They are known as "Hoffman claimants." There is no controversy between these cousins. There is a controversy between these six cousins and other claimants, especially those from Butler County, who have appealed to this court; the Commonwealth contends against all claimants to the estate. The fund in controversy, originally $81,504.52, after deducting taxes, transfer inheritance tax, legal and other expenses, is $42,-630.91. The court below found against the claimants and awarded the fund to the Commonwealth under section 1314 of the Fiscal Code, the Act of April 9, 1929, P. L. 343. From that decree these appeals have been taken by the six persons claiming to be cousins of the decedent.

The first question called to our attention is the form of the decree under section 1314, assuming the court below was right in other matters. The part objected to in the decree awarding the fund to the Commonwealth are the words "to be transmitted to the State Treasurer of Pennsylvania in the nature of an escheat," and it is argued that the decree should read that the funds be paid "into the State Treasury, through the Department of Revenue" pursuant to the Act of 1929. The main objection to the decree is that there were no escheat proceedings under the Act of May 2, 1889, P. L. 66, and neither color nor title to the funds could be given under this act. The

point is well taken, the lines objected to should be deleted and the decree made to conform to the Act of 1929.

The orphans' court is the proper tribunal to decide the questions of fact here raised. It has exclusive jurisdiction over the settlement and distribution of estates (Linsenbigler v. Gourley, 56 Pa. 166; Long's Est., 254 Pa. 370), and the power to distribute necessarily includes the power to determine all questions essential to a proper distribution: Dundas's App., 73 Pa. 474; King's Est., 215 Pa. 59; Brandt's Est., 83 Pa. Superior Ct. 322. The burden rested upon appellants to prove their claim by a fair preponderance of trustworthy and satisfying evidence, as in civil cases: Com. v. Sweeney, 283 Pa. 520. See Wigmore on Evidence (2d ed.), section 2498; 18 C. J. 874; 10 R. C. L. 204. Had the court below decided in favor of the claimants it could have directed in the present proceedings that the funds be turned over to them; if the decree of the court below against the claimants is sustained in this court, then as the record stands there are no claimants. There is then in the possession of the fiduciary moneys not awarded to any claimant, and which may be paid into the state treasury under the Act of 1929. Payment of unclaimed moneys by a fiduciary under the Fiscal Code preserves to anyone legally entitled thereto the right to subsequently prove his claim as provided in the act. Among the matters accomplished by the Act of 1929 was that it saved the Commonwealth a large amount of money heretofore paid to escheaters in fees. See Miles v. Metzger, 316 Pa. 211. But it does not take away the right of a lawful claimant to assert a claim subsequently.

The contest before the court below was, who takes the property of a decedent who dies without issue or known relatives? It is only by the grace of the Commonwealth that heirs or legatees are permitted to receive any benefit from a decedent's toil and energy. But it reserves to itself the right, as it always has, to take the property of a decedent when under its laws there is no one in a posi-

tion to inherit. The property of an intestate decedent who dies without known heirs is not mere flotsam or jetsam to be taken by anyone claiming it. In such circumstances, the Commonwealth stands in relation to the property of the decedent as one asserting a substantial right thereto. The Commonwealth's claim is not based on charity, gratuity, or unearned benefit; it was by its protection that it was possible for the decedent to accquire such accumulation of property as he possessed.

John H. Link was the son of Johann or John Link and Elisabetha Hoffman Link. John Link died April 2, 1901, at the age of 78, survived by his widow, who died August 20, 1901, aged 72, and three children: Catherine, who died in 1915, unmarried, intestate and without issue; Annie Catherine Zimmerman, who died in 1929, intestate and without issue, survived by her husband, Peter C. Zimmerman, and the intestate decedent, John H. Link. The latter, shortly after his parents' death, erected a monument over their graves which states that Johann Link was born July 13, 1822, and that his wife, Elisabetha, was born December 21, 1829. A Bible subsequently offered in evidence showed the birth of Johann as July 13, 1823. Both the father and the son had, for many years, receded from association with their fellow men and confined themselves to a small farm in Ross Township where John Link had established the family home. There, exercising the utmost frugality, even to the point of squalor, they amassed a considerable estate, which was carefully invested. This increase in wealth came principally from the produce of a small plot of ground.

Appellants, in seeking to establish kinship by means of birth, death and marriage records from Germany, and affidavits as to family reputation and the declarations as to relationship of deceased members of the family all coming from or near a particular place in Germany are confronted by a requirement—an underlying circumstance that must be established before such evidence is of

value as to kinship.  Satisfactory evidence must be produced showing the place of origin, the town or place in Germany from which decedent's parents came and where kinship was created.  These affidavits utterly failed to make the connection and establish this link in the chain. Peter Zimmerman, decedent's brother-in-law, was the principal witness before the master and the court below for this purpose.  Zimmerman's testimony attempts to fix the place that Johann Link and his wife came from in Germany.  The testimony of Lothes, for a similar purpose, was also before the court, but it was found vague and indefinite.  The court below refused to credit any of this testimony as reliable.  It is stated in Judge TRIMBLE's findings and conclusions, concurred in by the other judges of the court in banc, "Nor is there any satisfying evidence in the case at bar that John H. Link left any relatives to succeed to his estate.  In so far as Peter C. Zimmerman's (the son-in-law) testimony about John H. Link's family is reliable, we are confined to it for the facts about his provenance, his marriage, and his children."  Further: "It is now more than eighty years since John Link left Bavaria and perhaps quite as long since his wife left, if she ever lived there at all.  There is no testimony from any witness called in this case before the master or the court, except Peter Zimmerman, to show that Elisabetha Hoffman, the widow who married John Link, ever lived in Bavaria. *There is not a word of reliable testimony in this case to show from which one of the innumerable towns, of the large political division of Germany known as Bavaria, John Link of Ross Township came.*  It is startling to think of any hope of founding a decree upon such flimsy hearsay testimony as we have in the ex parte affidavits offered by the Bavarian claimants or the unsatisfying testimony of Zimmerman."  Of course the affidavits would be of no evidential use or value unless John Link, the father, can be definitely located at some place in Bavaria.  The court below was not satisfied that the witnesses relied on by the claimants were

credible, and, not believing them, it refused to find a decree for appellants.

With respect to Zimmerman's testimony, we quote from appellants' brief: "In the first place, appellants desire to point out that Peter C. Zimmerman's first and primary interest in all the matters involved in the estates of decedent, decedent's father, and decedent's sisters, was to get out of them all that he could for himself, which he certainly succeeded in doing. He was not friendly to the interests of any next of kin left by John H. Link, and his various affidavits and testimony shown on the record before the auditing judge gives very certain indication that it was only by slow degrees that he disclosed facts within his knowledge that could be, and eventually were, of assistance to the inquiry. After he was assured of the success of his own efforts to obtain as much as he could, his recollection improved. This is demonstrated by his withholding from the master the information about the family Bible and his knowledge of the friendship which existed between the Links and the South Side people, who turned out to be John Lothes and his uncles." A judge who disbelieves such a witness should not be criticized when counsel speaks of him thus.

Furthermore the court rejected the ex parte affidavits as being incompetent. Incompetency may come from deficiency within the affidavit or from some extraneous cause. Incompetency covers a wide field. Ex parte affidavits are generally inadmissible as not being the best evidence, especially when the persons making them are living and able to testify either in court or by deposition. The estate was well worth a trip from Germany and if appellants had sufficient faith in their cause they should have come. Direct testimony is of a higher grade and should be insisted upon in pedigree cases. If the statements contained in the ex parte affidavit are evidence, there is a proper way to place them in the record.

We have no doubt that pedigree may be proven by certain types of hearsay evidence, but kinship which carries

with it a claim of property against the claim of the State should be proved by something more than a guess, it should be built on a sound basis. Johann Lindner stated in the ex parte affidavit that "I knew Johann Link who lived there and died at Neuhof in 1910. . . . I often talked with Johann Link who died in 1910 about his brothers and sisters. He told me that some of them had gone to America and they had never heard from them. That he had a brother Johann, the same name as himself who was in America and was married to Elizabetha Hoffman, a girl from Preunersfeld, which is about two or three miles from Neuhof." Here the declarations as heresay evidence were those of a brother. In Sitler v. Gehr, 105 Pa. 577, 596, it was stated: "I entirely agree that, in order to admit hearsay evidence in pedigree, you must, by evidence dehors the declaration, connect the person making them with the family." Sitler v. Gehr, supra, holds that declarations are admissible if, first, the declarations are made ante litem motam; second, the declarant is dead; and, third, the quotation just noted; to which the court below adds, "there must be some evidence independent of the statement itself that the person making the statement is related to the family about which he speaks." As stated in Gerrity v. Sovereign Camp, 85 Pa. Superior Ct. 288, 291: "The rule does not require that the witness who testifies in court must be related to the person whose pedigree is under consideration but that the declarant whose statements are given in evidence by the witness was so related." The court below in holding that the chain of relationship was not proved, did not hold that the person who made the affidavit should be related to the Link or Hoffman families. It did require that the person who made the declaration, namely, Johann Link, should be related to the families, and that should be shown by "evidence dehors the declaration." That is, evidence apart from Johann's declaration to connect him with the family.

To support the catena or chain of relationship and furnish "evidence dehors the declaration" it is urged that the birth certificate offered in evidence (Johann Link, July 13, 1822, and John Georg Link, born January 27, 1828), prove that "the Johann Georg Link, as to whose declarations Johann Lindner made the affidavit, was the younger brother of Johann Link, the latter admittedly being the father of the decedent." Johann Lindner's ex parte affidavit does not speak of Johann Georg Link; he speaks of Johann Link who died in 1910, and who, this record shows, was not born in 1828, but according to the baptismal certificate was born in 1834, and according to the death certificate from the Registrar of the Bureau of Vital Statistics, was born in 1840; this Johann Link was not the Johann Link whose baptismal certificate shows him to have been born July 13, 1822. (It is claimed that Link was the father of John H., the decedent, but Zimmerman says he was born in 1823.) There is another reason why Lindner was not testifying as to Johann Georg Link's declaration. Johann Georg, according to a death certificate in evidence, died February 18, 1868, while the Johann that Lindner speaks of died in 1910. These baptismal and other records do not prove Johann Link, or John Link, in America, the father of John H. Link, was the brother of Johann Link who is supposed to have made the declaration, nor is there anything dehors the record that would prove that fact. It would appear that these parents named three of their boys Johann, a most unusual circumstance even in Germany. The name Georg can not be added to Johann in Lindner's ex parte statement.

The court below called attention to the fact that Lindner speaks of Johann Link, who was in America and married to Elisabetha Hoffman, who had gone to Pittsburgh; a brother had paid to her the share of her father's estate. Zimmerman stated that she did not get her portion of the estate in Germany, and he further states, on at least three

occasions when called to testify, that Elisabetha Hoffman was married in Germany having one child and came with it to America.

The court below also refused to credit these certificates and the ex parte statement. If a chain of relationship can be built up through birth certificates and ex parte statements, as offered here, there would be no escheated estates in Pennsylvania.

It is our duty to examine all the testimony, which we have done. The witnesses were before the court below, and the judges were better able than we are to decide to whom credit ought to be given and from whom it ought to be held. When a hearing judge refuses to believe the testimony of a witness, his conclusion as to credibility will not be disturbed unless his acts are biased, capricious or unreasonable. After a careful review of the testimony, with the knowledge that the opinion writer in the court below saw the witnesses and observed their behavior while testifying, and duly noting what appellants' counsel has stated as well as the contradictions and other matter appearing in the testimony, the court below did not err in rejecting the testimony as not being credible. Therefore the findings of fact of the court below must stand unless manifest error or mistake otherwise clearly appears: Stevenson's Est., 272 Pa. 291; Comly's Est., 185 Pa. 208; Keyser's App., 124 Pa. 80; Clabby's Est., 308 Pa. 287.

The name "Link" is quite common. One can scarcely pick up a directory in a town of any size but that the name appears, therefore identity of names would not be helpful. Identity of names, religion and nativity alone are insufficient to evidence family connection. The evidence to sustain relationship must bear on every material feature necessary to support a finding of kinship. It must be grounded on a reasonable certainty and come from witnesses whose truth and candor are not questioned. To defeat the claim of the Commonwealth the evidence must be so clear, precise and definite in quality

and quantity as to satisfy the court below that the relationship claimed existed. The court in a proceeding of this character sits as a jury to weigh and consider the relevant testimony, and when a finding is made it is binding on this court unless there has been legal error in the course of its submission.

We do not find such error to have been committed in this case, and, with the modification of the decree as above noted, the decree of the court below is affirmed. Costs to be paid by the appellants.

DISSENTING OPINION BY MR. JUSTICE MAXEY:

I dissent from the opinion filed in this case. I am convinced that the procedure followed in the court below is erroneous and the result wrong. I do not agree with the majority opinion that "The orphans' court is the proper tribunal to decide the questions of fact here raised." The majority opinion says: "It [the orphans' court] has exclusive jurisdiction over the settlement and distribution of estates (Linsenbigler v. Gourley, 56 Pa. 166; Long's Est., 254 Pa. 370 [98 A. 1066]), and the power to distribute necessarily includes the power to determine all questions essential to a proper distribution: Dundas's App., 73 Pa. 474; King's Est., 215 Pa. 59 [64 A. 324]; Brandt's Est., 83 Pa. Superior Ct. 322." The error is not in the principles cited *but in their application to the instant case.* The case of Linsenbigler v. Gourley, supra, had nothing to do with escheat proceedings. It simply held that certain writings did not constitute a present gift but expressed a future purpose. This case was decided in 1867, twenty-two years before the Escheat Act of 1889. Long's Est., supra, involved no question of escheat. It held only that the orphans' court was the proper forum for the determination of the amount of a child's share in the estate, and quoted the language above cited from Linsenbigler v. Gourley. The case of Dundas's App., supra, was decided in 1873, sixteen years before the Escheat Act of 1889. There was no question of escheat before the court

in that case. Before the amount of a certain legacy was ascertained, the legatee assigned it to the wife of an executor for a sum much less than was later ascertained to be its value. He petitioned the orphans' court for a decree against the executors to pay him his legacy, setting out the assignment and alleging that it was obtained by fraud. It was held that the orphans' court had jurisdiction. King's Est., supra, involved no question of escheat. It related to the power of the orphans' court to distribute a fund in partition. Brandt's Est., supra, merely decided that where two creditors claim the same commissions owed by a decedent, the orphans' court has the power to ascertain the persons to whom the distribution must be made.

I do not question the power of the orphans' court in the instant case to proceed *initially* in this matter but I hold that in its procedure it ought to have conformed to the provisions of the Escheat Act of 1889, P. L. 66. This act provides in section 4, "that whenever . . . the Auditor General of the Commonwealth shall become aware of the fact that any property . . . hath escheated or is supposed to have escheated to the Commonwealth . . . he shall appoint . . . some suitable person . . . to act as escheator of said property." Section 7 provides that an escheator may apply by petition to the court to determine whether an escheat has occurred or not. Section 8 provides "that whensoever any proceedings in escheat have been instituted . . . the court shall, upon the filing of any account . . . by any administrator, . . . proceed to the audit and adjudication of said account . . . and shall upon said audit, proceed to inquire and determine whether there has been any escheat or not." Section 9 provides that "whenever . . . there shall be any disputed fact or facts touching said escheat, then and in that case, the said court shall, upon application of the escheator, . . . frame an issue or issues to determine said disputed question or questions of facts, which said issue or issues shall be tried in the court of common pleas

of the county in which the proceedings in escheat shall have been instituted, and shall . . . be certified to said court for that purpose. . . . The court of common pleas in which the same shall have been tried, shall certify the result thereof to the court in which the said proceedings in escheat have been instituted."

Section 24 of the Intestate Act of June 7, 1917, P. L. 429, as amended by the Act. of April 18, 1923, P. L. 70, provides: "In default of all such known heirs or kindred or surviving spouse, competent to take as aforesaid, the real and personal estate of such intestate, remaining after the payment of all just debts and legal charges, shall be sold by the executor or administrator of the estate, and the net proceeds shall be, by him, paid into the state treasury for the use of the Commonwealth. Such sale shall be made only under the supervision of the court having jurisdiction of the estate, and in accordance with the laws of the Commonwealth providing for the payment into the state treasury of unclaimed funds in the hands of fiduciaries."

Section 5 of the Act of May 16, 1919, P. L. 169, 172, provides: "Whenever on the audit or adjudication of the account of any fiduciary there shall be and remain in his possession any moneys not awarded to any claimant or claimants, or any moneys which shall have been awarded to any claimant or claimants the whereabouts whereof, or that of their legal representatives, the fiduciary has been unable to ascertain, the fiduciary shall, within sixty days after the date of said audit or adjudication, file in the court having jurisdiction of his account a sworn statement of such unawarded or unclaimed moneys . . . in the . . . manner prescribed in the second section of this act, and thereupon proceedings to secure the payment of such moneys into the state treasury to be refunded as hereinbefore provided, shall be had. . . ."

The Commonwealth, i. e., appellee here, does not challenge the fact that unless the Escheat Act of 1889 has been superseded by later acts, particularly by the Act of

April 9, 1929, the proceedings had in the court below were irregular; its contention is that this Act of 1929 provides a new method for the escheating of moneys to the Commonwealth. In Alton's Est. (1908), 220 Pa. 258, 264, 69 A. 902, this court said: "Jurisdiction to escheat property to the Commonwealth is conferred and regulated by statute. . . . Section 22 of the act [of May 2, 1889, P. L. 66, supra], provides: . . . 'Any persons . . . claiming to be interested in any property . . . which shall be found to have escheated to the Commonwealth . . . who have had no actual notice by citation, advertisement or otherwise of the pendency of any proceedings in escheat . . . may at any time within three years next after the filing of the final adjudication or finding in escheat, or the absolute confirmation thereof, traverse the same under oath or affirmation, by writing filed in the court finding the same.' In case of a traverse, the adjudication of escheat is required to be certified to and tried in the common pleas. If the person filing the traverse is successful and sustains his claim to the money, the Commonwealth is required to pay it to him."

If the Act of May 2, 1889, supra, is not superseded by the Acts of 1917, 1919, 1923 and 1929, in regulating the procedure in escheat cases, there is no room for doubt that the procedure in the court below was erroneous. The Commonwealth in the instant case is relying upon the later acts above cited as superseding the Escheat Act of 1889. This court held in Miles's Est., 272 Pa. 329, 339, 116 A. 300 (1922): "When the statute under consideration is a general revision, 'the law as therein written will be deemed to be the same as it stood prior to the revision, unless we find from the statute itself, or its history, a clear intention to change it': In re Lis's Est., 139 N. W. 300, 302, and cases cited there." In the instant case, the Acts of 1917, 1923 and 1929, do not purport even to be a general revision of the law of escheat. Therefore, I have no difficulty in deciding that these acts must be construed in pari materia with the Escheat Act

of 1889. In Russ v. Com., 210 Pa. 544, 60 A. 169, this court said: "The correct rule of interpretation is, that if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them, and it is an established rule of law, that all acts in pari materia are to be taken together, as if they were one law: Doug. 30; 2 Term Rep. 387, 586; 4 Maule & Selw. 210." The Acts of 1917, 1923 and 1929 providing for the payment into the state treasury of the proceeds of the real and personal estate of an intestate who dies in default of known heirs or kindred or surviving spouse presuppose that no one has claimed to be "the known heirs, or kindred, or surviving spouse," *or* that, if a claim or claims have been made, the issues thereby raised have been decided adversely to claimants. The provision in section 1314 of the Fiscal Code of 1929 that "the fiduciary shall, within sixty days after the date of said audit or adjudication, file, in the court having jurisdiction of his account, a sworn statement of such unawarded or unclaimed moneys," is not inconsistent with section 9 of the Act of 1889, which provides that whenever "there shall be any disputed fact or facts touching said escheat, then and in that case, the said court shall, upon application of the escheator, or any other person interested or claiming to be interested in the said proceedings, prior to the filing of a finding or adjudication therein, frame an issue or issues to determine said disputed question or questions of facts; which said issue or issues shall be tried in the court of common pleas." The appellee here cites on this question an opinion by Deputy Attorney General William M. Hargest, 29 Pa. Dist. Rep. 749, dated February 3, 1920, in response to a query asking whether section 24 of the General Escheat Act was repealed by section 5 of the Act of May 16, 1919, P. L. 169. Section 24 of the Act of 1889 provides for a reward to the person who shall first inform the auditor general, by writing, that an escheat has occurred by reason of the fact that any person has died intestate, etc. The attorney gen-

eral's answer to that question was that this act merely "changed the policy of the State with reference to the payment to it of *unclaimed* funds. [Italics supplied.] . ·. . The conclusion is irresistible that in so far as the General Escheat Act of May 2, 1889, P. L. 66, as amended by the Act of May 11, 1911, P. L. 281 [amending only the 3d, 5th, 24th and 27th sections of the former], applies to *unclaimed* moneys in the possession of any fiduciary, that act is supplanted, and therefore repealed by the Act of May 16, 1919, P. L. 169." It follows that the opinion of the deputy attorney general is inapplicable here because the moneys now in controversy are not *unclaimed.* The opinion in Costello's Est., 15 Pa. D. & C. 235 (1931), cited by the appellee, is equally inapplicable. That was a case of where there were *no claims* made in behalf of heirs or next of kin, and the question at issue was whether or not the person who had given notice to the auditor general that the estate had escheated to the Commonwealth was entitled to the fee provided for in the General Escheat Act, supra. Appellee also cites Apsley's Est., 8 D. & C. 345, which likewise applies only to *unclaimed funds* in the hands of fiduciaries, and the only question raised related to the fee demanded by the informer.

In its paper book the Commonwealth recognizes the fact that the trial by jury provided for in section 9 of the Escheat Act of 1889 was not expressly affected by later legislation, for the Commonwealth there says: "The Act of 1919 was obviously a departure from the Escheat Act of 1889, P. L. 66, as amended by the Act of May 11, 1911, P. L. 281, and was passed for the express purpose of saving the Commonwealth large expenditures in compensating informers and escheators. To effect this result a system for the payment to the Commonwealth of unclaimed money, *other than by escheat,* was created by the act." (Italics supplied.)

As soon as these claimants appeared by counsel and made out a prima facie claim of relationship to the intestate, giving rise to a substantial issue of fact, the audi-

tor general should have been informed and an escheator should have been appointed pursuant to the provision of section 4 of the Act of 1889, and upon his application, or that of any other person interested or claiming to be interested in the proceedings, an issue should have been framed to determine the disputed question. It appears from the record that no escheator had been appointed and neither did the claimants here apply to the court for the framing of an issue for trial in the court of common pleas.

The question then arises: Should the court have framed an issue upon its own motion? We have an analogy under the Orphans' Court Act of June 7, 1917, P. L. 363, section 21 (b). This act reads in part as follows: "Whenever a dispute upon a matter of fact arises before any orphans' court, on appeal from any register of wills, or on removal from any register of wills by certification, the said court shall, at the request of either party, direct a precept for an issue to the court of common pleas of the county for the trial thereof. . . ." This court in Cross's Est., 278 Pa. 170, 122 A. 267, discussed the question of whether or not the orphans' court must, when requested so to do by any party in interest, if that request is made in due season, send such issue to the common pleas, and held that the orphans' court has power of its own volition to send any issue of fact to the common pleas. This court said in that case: "The power of the orphans' court to send an issue to the common pleas in a contested will case is not dependent on the request of a party in interest, regardless of whether or not the granting of such issue by a register's court was so dependent under the Acts of 1832. . . . The obligation imposed on the orphans' court, to grant issues in contested will cases when so requested by parties in interest, did not take from that tribunal the general privilege theretofore enjoyed of awarding issues in connection with all matters under its jurisdiction *whenever it deemed it expedient so to do.* [Italics supplied.] . . . In Fleming's Est., 265 Pa. 399,

409 [109 A. 265], we mistakenly stated that Byerly's Est., 258 Pa. 410 [102 A. 143], holds 'the orphans' court has no power to grant an issue in a will contest . . . unless there is a request therefor.' " In Timmes's App., 237 Pa. 189, 85 A. 136, this court said: "Under section 41 of the Act of March 15, 1832, P. L. 135, an issue devisavit vel non is of right where there is a substantial dispute upon a material question of fact, and the test is whether, under all the testimony, a verdict against the will should be allowed to stand. Graham's Est., 225 Pa. 314 [74 A. 169]." See also Knauss's App., 114 Pa. 10, 6 A. 394. In the estate of John Ketterer, 42 L. I. 501, Judge PENROSE said: "The right to an issue on an appeal to the orphans' court . . . is not lost by reason of its not having been demanded when the matter was before that official, or because the questions of fact were submitted to him. . . . As against facts admitted or established by evidence that cannot be impeached, an issue will b'e refused where the ground relied upon rests on a mere scintilla; . . . The court may pass upon the question of insufficiency but they cannot upon the question of truthfulness. 'Where there is any evidence which alone would justify an inference of the disputed fact,' said SHARSWOOD, J., in Express Co. v. Wile, 14 Sm. 105 (the case in which the doctrine of 'scintilla' was declared to be exploded), it must go to the jury, no matter how strong or persuasive may be the countervailing proof. . . . Where evidence on both sides is to be weighed, so as to determine on which side the scales incline, the jury is the appropriate tribunal.' "

I have cited the foregoing cases because there is a close analogy between the practice in awarding an issue of devisavit vel non in cases of will contests and the practice in awarding an issue in cases where the Commonwealth claims an escheat and proof has been presented strongly controverting the claim of the Commonwealth that an intestate owning property died without heirs or known kindred. The practice of trying issues in cases of this

kind, i. e., escheat cases, before a jury is too long estab-
lished in this Commonwealth to be set aside unless the
legislature in unequivocal language has superseded the
established method of adjudicating such issues, and there
is no such provision in the Fiscal Code or in any other
statute. As early as the 29th of September, 1787, 2
Smith's Laws, page 425, it was provided (in section 3)
that when the Commonwealth claimed an escheat, the
sheriff or the coroner had "to impanel . . . twenty-
four good and lawful men . . . to come before the
. . . escheator . . ." at some public place within the
county to inquire whether "the said person hath died
without heirs or known kindred . . ."

In the instant case it appears from the opinion of the
court below that the practice in Allegheny County, at
least since the Fiscal Code of 1929, has been to dispense
with trial by jury in cases of this character. The lan-
guage of the opinion is as follows: The balance of $41,-
299.31 ". . . was distributed under the authority of the
Fiscal Code Act of 1929, P. L. 343, article XIII, section
1314, P. L. 419, 'to the Commonwealth of Pennsylvania
to be transmitted to the state treasurer of Pennsylvania
in the nature of an escheat,' which form of decree is sat-
isfactory to the Commonwealth and is now the practice
of this court." It is fair to assume that because of the
practice prevailing in that court, claimants did not ask
to have an issue framed and awarded as provided in sec-
tion 9 of the Escheat Act of 1889. The voluminous rec-
ord in this case discloses a substantial dispute on the
question of whether or not the six claimants are first
cousins of the intestate, and this dispute is one that is
particularly appropriate for the determination of a jury.
I think that justice requires that this record be returned
to the orphans' court and that when this is done, the
court should notify the auditor general to appoint an
escheator if he desires so to do, and upon the application
of either the escheator or the claimants, an issue should
be framed and certified to the court of common pleas and

the result, after determination, certified back to the orphans' court, in accordance with the provision of section 9 of the General Escheat Act of May 2, 1889, P. L. 66. In the comparatively recent case of Com. v. Sweeney, 283 Pa. 520, 129 A. 577 (1925), the issue in escheat proceedings was certified by the orphans' court to the common pleas. This was obviously the correct procedure.

My review of the record in this case convinces me that the finding of the court below that the four "Link claimants" and the two "Hoffman claimants" are not first cousins of the intestate, John H. Link, is in the teeth of the evidence. Johann Link through whom the relationship of the claimants as first cousins of the decedent was established was undoubtedly the Johann Link who was born on July 13, 1822, in Bavaria, who came to this country in about 1850, and who married Elisabetha Hoffman at the Lutheran Church on Smithfield Street, Pittsburgh, in 1854 or 1855. The tombstone erected by his children on the grave of Johann Link bears the inscription: "Born July 13, 1822." A photograph of this monument with its inscription was properly received in evidence. It was competent to prove the date of birth of the person whose grave it marked. See Wigmore on Evidence (2d ed.), section 1495 and 22 C. J., page 253, section 245. The fact that the tombstone of Johann Link bears the same date of his birth as the birth certificate of Johann Link, the son of Joh. Gg. Link, a farmer in Neuhof, is most convincing that the John H. Link, the intestate in this case, was the son of the Johann Link, who was the uncle of the Link claimants. The majority opinion says: "A Bible subsequently offered in evidence showed the birth of Johann [Link] as July 13, 1823." This discrepancy of one year to the day, even though unexplained, would not be sufficient to destroy the conviction that the Johann Link, who was born in Bavaria on July 13, 1822, was the same Johann Link, who was buried under the tombstone described above. But, this discrepancy is explained. Peter Zimmerman, who was the son-in-law of

Johann Link, and who testified in this case, said of this Bible with the inscription in question: "I think the student he bought it [i. e., the Bible] from put the first lines in. I am not sure. John did put something in himself and then he rubbed it out." In other words, there is no evidence that this inscription in the family Bible was in the handwriting of Johann Link, or of anyone who knew the facts. If some student from whom Johann Link bought the Bible, entered the inscription, he could have misunderstood the date of 1822 and written 1823, and made an error of a year. There is absolutely no doubt that the inscription on the monument erected by Johann Link's son, who presumably knew the date of his father's birth, fixes the date of his birth as July 13, 1822. The birth certificate (Exhibit I-6) offered in evidence in this case from the files of the Evangelical Lutheran Parish Church, Pegnitz, shows that in the year 1822 there was born at Neuhof, District of Eschenbach on July 13th, Johann Link, whose father's name was Joh. Gg. Link, and whose mother's name was Anna Elisabeth Lothes. This evidence alone ought to be sufficient to establish the fact that the Johann Link who was born on July 13, 1822, and the Johann Link who was buried under the tombstone which gives the date of his birth as July 13, 1822, are one and the same person. Besides, we have the testimony of Peter Zimmerman, the son-in-law of Johann Link, and a brother-in-law of the intestate, John H. Link, who testified that his father-in-law, Johann Link, and his mother-in-law, Elizabetha Hoffman Link, were born in Bayern, or Bavaria, in towns only three or four miles apart. Zimmerman testified that Johann Link's wife, Elizabetha Hoffman, was born on December 21, 1829. This corresponds to the date on the tombstone. Zimmerman also testified that Johann Link was born on July 13, 1823. This was an error of one year. It was obviously based on his erroneous recollection of the date that was on the tombstone, for when asked what date was on the stone, he replied: "July 13, 1823." In fact, the date is

July 13, 1822.   He also said that the date, July 13, 1823, appears in the family Bible.   He explains, as already quoted, that the entry in the family Bible was probably made by the student from whom the Bible was purchased. The relatives who erected the monument made no such error but inscribed on the stone as the date of Johann Link's birth, July 13, 1822.   Zimmerman further testified that Johann Link always declared that he had no relatives in this country and was one of a large family in Germany.   He, Zimmerman, thought Mrs. Link's family was small, consisting only of one or two brothers and no sisters.   The records offered in evidence in this case corroborate Zimmerman as to this.

Another witness, John Lothes, testified that his parents were born in Preunersfeld, near Pegnitz, Bavaria, that he himself was born in the United States, and that when he came to Pittsburgh from Ohio, his mother told him to look up the family of Johann Link in Pittsburgh because she and Mrs. Link had gone to school together in the old country.

On appellants' behalf, there were also presented a number of certified birth, death, and marriage records from Germany, together with affidavits (to which the Commonwealth waived any objection based on inability to cross-examine the affiants), from two of the claimants, and from a third party not a relative, as to family reputation and the declarations of deceased members of the family as to their relationship.   These birth records were competent evidence.   See American Life Ins. Co. v. Rosenagle, 77 Pa. 507.   They made out a pedigree showing that the paternal claimants are the only surviving nieces and nephews of a Johann Link, who was born in Neuhof, Bavaria, July 13, 1822.   This Johann Link was, as revealed by the record, one of 12 or 13 children born of Johann Georg Link and his wife, Anna Elisabetha Lothes.   The records produced on behalf of the maternal claimants show them to be the surviving nephews of an Elisabetha Hoffman, who was born on December 21,

1829, in Preunersfeld, Bavaria, one of the three children of Peter Hoffmann and Barbara Breitenfelder.

In his affidavit, Exhibit "J" (324a), Johann Lindner states that he is no relative of the claimants, that he lives at Preunersfeld, Bavaria, which is two or three miles from Neuhof, that he knew a Johann Link, who died in Neuhof in 1910, his sister Margarethe, who married Georg Woelfel, his sister Margarethe, who married Johann Beck, and another sister, Catherine, who was the second wife of Johann Lindner. He had talked with all of them while they were alive, especially with Johann, and by him had been told that some of his brothers and sisters had gone to America, among them a brother Johann, who had married an Elisabetha Hoffmann, a girl from Preunersfeld. Lindner also stated that he knew an uncle of the maternal claimants, a Johann Hoffmann, who lived in Preunersfeld and who told him that he had a sister, Elisabetha, who went to Pittsburgh, and married a Johann Link from Neuhof, one of the Link family known to the affiant. Affiant further deposed that Johann Hoffmann had corresponded with his sister, Elisabetha, about the estate of their father, and he, Hoffman, told him, Lindner, that he paid Elisabetha her share. After that, Lindner believed, Johann Hoffmann did not correspond with his sister, although he continued to mention her from time to time. Johann also told the affiant that his sister had children but Lindner was unable to recall their names.

Barbara Imhof, one of the paternal claimants, deposed that she was born in 1851, the daughter of Johann Lindner and Margarethe Link, and that she was married to Johann Imhof. From her uncle, Johann Link, and from her stepmother, Anna Margarethe Link, a sister of her mother, she had heard ever since childhood that she had an uncle, Johann Link, who had married an Elisabetha Hoffmann from Preunersfeld. Her mother (a Link) had (so she testified) eleven brothers and sisters. She averred that "as long as I can remember and until the

death of my stepmother [a Link] and the death of my uncle Johann Link [who died in 1910], I have known that my mother had a brother Johann Link in America, who was married to Elisabetha Hoffmann, a girl from Preunersfeld. I know that some letters came from this uncle and his wife many years ago."

Heinrich Hoffman deposed that he was born in 1866, the son of Johann Hoffmann, who was one of the three children of Peter Hoffmann and Barbara Breitenfelder, that his father's sister, Elisabetha Hoffmann, went to Pittsburgh, where she married Johann Link; he knew this, he said, because she corresponded regularly with his father between 1880 and 1885, at which time the estate of Peter Hoffmann was settled, and the affiant's father paid his sister, Elisabetha, her share. He knew from his mother and father who frequently spoke about his Aunt Elisabetha, that she had children, but he did not know their names. He also deposed that he knew the Johann Link, who lived in Neuhof and died in 1910, and several of his sisters, being the same persons that Johann Lindner mentioned in his affidavit, and that he had heard from them that it was their brother, Johann Link, who had married his aunt, Elisabetha Hoffmann, in Pittsburgh.

It is appellants' claim that their uncle and aunt, Johann Link and Elisabetha Hoffmann, were the parents of the intestate decedent, John H. Link. Appellants have produced proof of their relationship to Johann Link and Elisabetha Hoffmann, and the evidence warrants the finding that the latter are the same persons who were married in the Lutheran Church on Smithfield Street, Pittsburgh, in 1854 or 1855, and who were the parents of John H. Link. The testimony establishes that Johann Link, the father of John H. Link, was born on July 13, 1822, and that his wife, who before her marriage was Elisabetha Hoffmann, was born December 21, 1829. They were both born in Bavaria in towns a few miles apart and were of the Lutheran faith. The Links came from "Nei-

hoff" or "Niedorf" and Mrs. Link originally came from Preunersfeld near Pegnitz. Both Johann Link and his wife ceased to correspond with relatives in the old country because of quarrels over inheritances. The Bavarian birth and baptismal certificates disclose a Johann Link born July 13, 1822, at Neuhof, and baptized in accordance with Lutheran rites, and an Elisabetha Hoffmann born December 21, 1829, at Preunersfeld, a village three or four miles from Neuhof, who was baptized in the Lutheran faith. There is thus not merely the identity of name (which *alone* would be insufficient to establish relationship: Com. v. Sweeney, 283 Pa. 520, 528, 129 A. 577, and Sitler v. Gehr, 105 Pa. 577, 601), but also identity of *place of origin,* of *birth date,* and of *religious affiliation.* The records also corroborate Zimmerman's statements that Johann Link was a member of a large family and Elisabetha Hoffmann of a small one.

The affidavits presented on appellants' behalf were competent evidence. They meet all the requirements for pedigree exceptions to the hearsay rule: (1) the declarant must be dead, (2) the declarations must have been made before the controversy arose, and (3) declarant must have been related to the family of which he spoke: Sitler v. Gehr, supra; see Wigmore, Evidence (2d ed.), section 1480 et seq. These three conditions were fully complied with. The court below conceded that the first two conditions were complied with but fell into error in applying the law to the third condition. As to that the court said: "But a prior condition to both these [i. e., conditions 1 and 2] is that it should be proved by some source of evidence independent of the statement itself that the person making the statement is related to the family about which he speaks." The court then quotes the following from Sitler v. Gehr, supra (105 Pa. 577): The "rule does not require that the witness who testifies in court must be related to the person whose pedigree is under consideration but that the declarant whose statements are given in evidence by the witness was so re-

lated," and adds: "The catena of relationship was not proved and, therefore, the objection of the Commonwealth's deputy attorney to the competency of the affidavits must be sustained." The court below misapplied the rule which it quoted. This rule does not require that Johann Lindner and the others who made affidavits in this case be related to the Link and Hoffmann families of which they spoke. It requires merely that *the persons whose declarations they quoted* should be related to the families about which *the declarant* spoke. The catena or chain of relationship between the declarant and the Link family was proved by competent evidence. The birth certificates offered in evidence prove that the Johann Link, as to whose declarations Johann Lindner made the affidavit, was the younger brother of Johann Link, the latter admittedly being the father of decedent. Many of the declarations in the affidavits were attributed to Johann Link, who was born in Neuhof on September 8, 1834, and died there in 1910. It *was* shown by "evidence aliunde," i. e., by the birth records in evidence, that he was the younger brother of Johann Link, who was born in Neuhof on July 13, 1822, and who, appellants with good reason contend, was the same Johann Link who died in Ross Township, Allegheny County, in 1901, and who according to the inscription on his tombstone was born on July 13, 1822. The birth certificate shows sufficient relationship between Johann Link and Johann Link, the declarant referred to in the affidavit of Johann Lindner and others, as to make Lindner's testimony on this point competent. The competency of this testimony is ruled by the decision in the case of Sitler v. Gehr (supra), 105 Pa. 577. There the plaintiff's father was Joseph Gehr, while the deceased's ancestor, through whom he wished to establish relationship, was Balser Gehr. In that case the court, speaking through Mr. Justice PAXSON, said: (page 592) "It was contended that the declarants must be shown by evidence aliunde to be related to Balser Gehr, of Berks County; in other words, to the person

last seised of the estate, or his particular branch of the family. To state the question in another form: the declarants were Anna Maria Gehr and John Gehr; the plaintiffs' ancestor was Joseph Gehr; the deceased ancestor was Balser Gehr, of Berks County. It was not denied that the declarants were of the family of Joseph Gehr, and it was attempted to show by their declarations that the above named Joseph Gehr and Balser Gehr were related to each. The question was, whether sufficient ground had been laid for such declarations. The plaintiffs in error contend, not only that the declarants must be shown by evidence aliunde to be related to the family as to which the declarations were made, but also that they must also be thus shown to be related to the person who died seised. The first part of this proposition is undoubtedly true under all the authorities; the latter portion of it is not so clear. I have carefully examined all the authorities cited on both sides upon this point, and many others to which our attention was not called upon the argument, and although there is some conflict in the cases the weight of authority seems to be that while a declarant must be shown by evidence aliunde to belong to the family, it does not appear to be necessary to show that he belongs to the same branch of it. In Vowles v. Young, 13 Vesey 147, it was held that the declarations of a deceased husband concerning the descent or pedigree of his wife are admissible. And in Jewell v. Jewell, 1 Howard 219, that the declarations of a deceased husband of one of the plaintiffs claiming as heir of her father, that his wife was not married to her father, were admitted." The evidence in the instant case was within the rule laid down in Sitler v. Gehr, supra. Johann Link who died at Neuhof in 1910, is shown by duly authenticated birth records to be the brother of Johann Link, who was born in Neuhof in 1822 the son of Johann Georg Link and Anna Elizabeth Lothes. In his affidavit, Johann Lindner declared that the Johann Link who died in 1910 (born 1834) in Neuhof "had a brother

Johann, the same name as himself who was in America and was married to Elisabetha Hoffman, a girl from Preunersfeld, two or three miles from Neuhof." There was another brother, Johann *Georg* Link born in Neuhof on January 27, 1828. It is a matter of common knowledge that in large families in Europe two or more members of the same family may have the same or similar names, two or more sons taking the father's surname and two or more daughters, the mother's. In the affidavit of Barbara Imhof, she states: "It is a common thing in Germany for two or more children of the same parents to bear the same given name or names, especially where the family is large." In fact, her mother and her stepmother, who were sisters, had the same name, to wit, Margarethe. The declarations of the Johann Link who was born in 1834, as to his brother Johann (12 years older), who emigrated to the United States, are competent. Justice PAXSON in the Sitler v. Gehr Case cites Monkton v. The Attorney General, 2 Russ. & M. 157, as follows: "To say that you cannot receive in evidence the declarations of A, who is proved to be a relation by blood of B, touching the relationship of B with C, unless you have first connected him also by evidence dehors his declaration with C, is a proposition which has no warrant either upon the principle upon which hearsay is let in, or in the decided cases; and it plainly involves this absurdity that if, in order to connect B with C, I am first to prove that A is connected with B, and then to superadd the proof that he is connected with C, I do a thing which is vain and superfluous, for then the declaration is used to prove the very fact which I have already established; inasmuch as it is not more true that things which are equal to the same thing are equal to one another, than that persons related by blood to the same individual are more or less related by blood to each other." See also Wigmore, op. cit., sec. 1491.

It is clear that the parents of the decedent are the same Johann Link and Elizabetha Hoffman shown to be ap-

pellants' uncle and aunt, and the latter are therefore first cousins of the decedent.

The majority opinion says: "There is no testimony from any witness called in this case before the master or the court, except Peter Zimmerman, to show that Elizabetha Hoffman, the widow who married John Link, ever lived in Bavaria. *There is not a word of reliable testimony in this case to show from which one of the innumerable towns, of the large political division of Germany known as Bavaria, John Link of Ross Township came.*" In answer to the first sentence, I wish to point out that the birth certificate offered in evidence shows that Elizabetha Hoffman was born at Preunersfeld on December 21, 1829, and the inscription on the tombstone in evidence in this case shows that the Elizabetha Hoffman, who was married to Johann Link, was born on December 21, 1829. These are facts from which with others in evidence the inference is legitimate that the Elizabetha Hoffman, who was the wife of Johann Link, was the same Elizabetha Hoffman, who was born at Preunersfeld, Bavaria, on December 21, 1829.

As to the second sentence, it is quite immaterial from which of the "innumerable towns, of the large political division of Germany known as Bavaria, John Link of Ross Township came." It was testified by one Seiferth that he had visited his old home in Bavaria recently, that there was a town named Pegnitz not far south of Bayreuth, in Bavaria, and that near Pegnitz were a number of villages, and among them were Preunersfeld, Neuhof, Langanreuth and Schnabelwaid. The birth certificate of Johann Link states that his father, Joh. Gg. Link, was a farmer in Neuhof. This latter town was admittedly in Bavaria.

The majority opinion says that "the affidavits [in evidence in this case] would be of no evidential use or value unless Johann Link, the father, can be definitely located at some place in Bavaria." As I read this record, he was "definitely located some place in Bavaria." He was

born in Bavaria, as the birth record shows and as the testimony of Zimmerman shows. I see no grounds for criticizing the good faith of the witness Zimmerman. I fail to see how he could profit by giving false testimony in this case. He had been married to the daughter (since deceased) of Johann Link, and certainly it is to be presumed that he knew something of the family history of his father-in-law. He should at least know where he was born. He was asked: "Did you ever hear old John Link tell where he was born?" A. "It was in Bavaria, but I don't know what part." Q. "Did you ever hear his wife Elizabeth say where she was born?" A. "She was born right close to where Link was—three or four miles." This witness Zimmerman was an aged man and presumably was suffering with some of the infirmities of old age, but his testimony indicates that he told a straight-forward story and knew what he was talking about.

The record in this case convinces me that the four Link claimants established their relationship as first cousins of John H. Link, the intestate, through the latter's father, Johann Link, and that the two Hoffman claimants established their relationship as first cousins of John H. Link through the latter's mother, Elizabetha Hoffman, and that this was all established by such preponderating testimony as to meet every requirement of the law. The testimony was practically all in favor of the claimants and there was nothing in the case to controvert it. Criticism is offered in the majority opinion because the claimants did not come from Germany to testify. The majority opinion says: "The estate was well worth a trip from Germany and if appellants had sufficient faith in their cause they should have come." One of the affiants, Barbara Imhoff, was at the time of making the affidavit later received in this case, 81 years of age. Johann Lindner, another one of the affiants, at the time of making his affidavit, was 69 years of age. Heinrich Hoffmann, another affiant, was 66 years of age at the time of making his affidavit. It is easily understandable that these

persons may have been unable physically or financially to have made the tedious and expensive trip to the United States from Germany to testify in this proceeding. They made clear-cut affidavits, in which they set forth the facts of the relationships of the Link and Hoffman claimants in a most convincing manner. These affidavits were competent evidence, as has been consistently ruled by this court in other cases in which pedigree was in issue. The affidavits, together with the competent evidence of the tombstone inscription, the birth certificates, and the testimony of Peter Zimmerman, leave no room for doubt in my mind that the relationship claimed in this case was established. As I said in the early part of this opinion, there were substantial issues of fact raised in this case which were preëminently for the consideration of a jury, as the unrepealed Escheat Act of 1889 provides.

I would reverse the decree of the court below with a procedendo.