## Sochanczak Estate

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

*Ostroff, Lawler & Baker*, for exceptant.

*Paul Green*, contra.

SHOYER, J., May 3, 1963.—The single exception pursued by counsel charges the learned auditing judge with error in refusing "to allow Anna Sochanczak to refute the claim of desertion by oral depositions, written interrogatories, or letters rogatory pursuant to the Pennsylvania Rules of Civil Procedure."

Michael Sochanczak executed his will on June 15, 1952, and provided, inter alia: "In the event that my wife, Anna Sochanczak, whose whereabouts have been unknown to me for years, is alive at the time of my decease, I give, devise and bequeath to her the sum of One ($1.00) dollar."

Testator died on October 17, 1957, without issue. His will, after a gift of $200 to St. Vladimer's Ukranian Orthodox Church, gave the residue of his $17,000 estate to eight named individuals, only two of whom are related to him, both of these relatives being first cousins. On August 21, 1958, the election of the alleged widow to take against the will was filed by Sydney

Finkelstein, Esq., who claimed to be Anna Sochanczak's attorney in fact. Said attorney signed the written election and also swore to the existence of his authority and the truth of the facts "set forth in the foregoing election . . . to the best of his knowledge, information and belief." The power of attorney referred to by Mr. Finkelstein has never been produced, but Mr. Lawler, who now represents claimant, subsequently tendered a bilingual power of attorney by the same Anna Sochanczak which was dated on or about May 20, 1959, and expressly revoked the power of attorney "heretofore given in this matter . . . to Mr. Finkelstein, Attorney at Law, of Philadelphia, Pennsylvania." We have examined this document submitted by Mr. Lawler, and also the general release, hereafter referred to, and observe that both lack the signature or identifiable crossmark of Anna Sochanczak. Each bears the holographic statement of a third party that he, or she, has signed the document for the illiterate Anna Sochanczak. Actually, however, in neither case is there any signature or sign that could possibly qualify as a signature for, of or on behalf of claimant as referred to in the holographic legend.

Mr. Lawler's power appointed the New York law firm of Wolf, Popper, Ross, Wolf & Jones, as attorney for Anna Sochanczak. It is common knowledge to the judges of this court that for some ten years at least this same law firm has represented Russian citizens, and other persons behind the Iron Curtain, in making claims against the estates of Philadelphia decedents. During the same period of time Mr. Lawler's law firm has been their Philadelphia correspondent.

To the aforesaid election the executor objected for want of proof of Mr. Finkelstein's power of attorney and the additional reason that Anna Sochanczak was a resident and citizen of Soviet Russia who had deserted decedent in 1913 and had borne a child about 1916,

after the desertion. These objections by the executor were filed of record on August 29, 1958, so as of that date and since, counsel for the alleged Anna Sochanczak has been fully aware that the authenticity of the alleged power of attorney would have to be established as well as proof of her nondesertion.

At the first audit before Judge Bolger, an offer of settlement of Anna Sochanczak's claim for $3,000, previously made to the executor, was withdrawn by Mr. Lawler, who held a bilingual general release, when the Commonwealth insisted on payment of any agreed sum to the State Treasurer under the Act of July 28, 1953, P.L. 674, known as the Iron Curtain Act, and section 737 of the Fiduciaries Act of April 18, 1949, P. L. 512, as added on February 23, 1956, P.L. 1084. Both of these statutes provide for payment into the State treasury when the court believes that a nonresident beneficiary would not have the actual benefit, use, enjoyment or control of the funds distributable to him.

On November 20, 1962, Mr. Lawler was notified of a rehearing set for January, 1963, and on January 11, 1963, he petitioned the court for a citation upon the attorney general and the executor to show cause why Ostroff, Lawler & Baker, attorneys for "Anna Sochanczak, widow and heir" should not be allowed to take depositions or file interrogatories "to properly prove the identity of the widow and heir of this estate under the Pennsylvania Rules of Civil Procedure." Mr. Lawler, as a member of the law firm, further averred that "it is necessary that petitioners be authorized to have the depositions of their client, Anna Sochanczak, taken before an American Consul with the right of cross-examination to opposing parties or in the alternative to be permitted to file interrogatories with the right of opposing counsel to file Cross-Interrogatories such Interrogatories also to be answered before an American Consul".

At the re-audit before Judge Bolger on January 15, the Commonwealth objected to the proposed depositions and interrogatories relying on Garrett's Estate, 335 Pa. 287, Martinzik Estate, 25 D. & C. 2d 701, and other cases, and it was on this basis that the learned auditing judge refused the petition.

In addition, the executor produced a witness, John Mihalchak, a first cousin of decedent, but not a beneficiary under his will, who testified that he had been raised in the same community in Russia with testator. He stated that testator left Russia for the United States in 1913, and he followed him here in 1926. He further testified that testator left a wife, Anna, in Russia who was a frequent visitor to the home of the witness's mother; that Anna bore a child a few months after testator's departure and another child in 1916 or 1917; that both children died; that testator never had access to Anna after he left for this country; that he heard Anna tell his mother that testator sent her money to come to America and wanted her to come "a dozen times to the United States but she didn't want to go"; and that he did not know if Anna survived decedent. The learned auditing judge found the testimony of John Mihalchak believable and sufficient to establish desertion by Anna.

We are all of the opinion that the facts in this case, as well as the law of this Commonwealth, amply support the ruling of the auditing judge in refusing the petition for depositions or interrogatories, and that there was no denial of due process to Anna Sochanczak.

Orphans' Court Rules ★36.1 (a) and (b) require leave of this court to take depositions "upon cause shown", and a special order in every case. Rule 36 of the Pennsylvania Supreme Court states that except as provided "by such general rule or special order, the practice relating to such matters shall conform to the practice in the local Court of Common Pleas. [§3:R.6]"

The instant petition is completely devoid of any factual averments on which to support petitioner's request. There is no sworn averment that Anna Sochanczak lacks the funds to make the trip over here to present her claim, or that her health is impaired or would be endangered by traveling; there is merely the assertion in exceptant's brief of argument that she is "impecunious" and the "size of the estate does not warrant" expenditures for travel. Since August of 1958, at least, she has known of decedent's will, that he claimed no knowledge of her for many years, and that all he was leaving her, *if alive*, was one dollar. From the moment that the executor's answer to her election was filed, her counsel have known that they would have to establish both her identity and her nondesertion. For almost four and a half years nothing was done to get her to America, or to explain why depositions or interrogatories are necessary. Even today there has never been any petition presented to this court for depositions to disprove the charge of desertion, only the one petition to prove identity. Yet counsel for Anna Sochanczak have excepted to Judge Bolger's refusal to permit a request which was never made to him.

We make no point of this other than to note it, as we prefer to dispose of Anna Sochanczak's complaint on broader grounds. We believe such to be the desirable judicial approach when considering a question of due process, although we must confess some present difficulties in the face of counsel's "hit and run" attack.

In his brief, counsel stresses Common Pleas Rules 4003(a)(2) and 4015(b). These rules require that depositions by oral examination of a witness more than 100 miles from the courthouse shall be taken by leave of court on motion. In a foreign country "depositions shall be taken (1) before a secretary of embassy or legation, consul general, consul, vice-consul, or consular agent of the United States, or other person authorized

to administer oaths by the laws of the United States, or (2) before such person or officer as may be appointed by commission or under letters rogatory. A commission or letters rogatory shall be issued only when necessary or convenient, on petition, and on such terms and with such directions as are appropriate . . ."

Anderson, in his commentary on Pennsylvania Civil Practice, Vol. 5, pp. 550, 551, 554, states that the grounds for depositions by oral examination should be expressly set forth and verified by affidavit. Here Mr. Lawler has sworn that his law firm represents "Anna Sochanczak, widow and heir in the above estate", but obviously his averment as to his client's identity is based merely on hearsay from his correspondents. This is inadequate both as to factual content and verification.

While Mr. Lawler has failed to specify the exact method which he prefers to bring the testimony of his client before the court in absentia, our answer is as definite as present circumstances will permit. It is the confirmed policy of the courts of this Commonwealth that foreign claimants to contested estates of Pennsylvania decedents must present their claims in person when demand is made by the other parties or the Commonwealth, and that lesser proof will not suffice. Garrett's Estate, supra, Link's Estate, 319 Pa. 513, and Martinzik's Estate, supra, have all considered this problem and specified the reasons for so holding, to wit, that justice to all parties concerned precludes special treatment for the convenience of a foreign claimant. Our Supreme Court, in Garrett, reviewed many of the English cases and concluded that "those opposing appellant's kinship to testatrix would appear to be entitled to the fullest opportunity to cross-examine, which, it must be conceded, cannot, without much restriction, be exercised by written cross interrogatories accompanying the letters rogatory.

"Before such an application is granted, the petitioner should bring to the attention of the court circumstances to satisfy the court that it is in the interest of justice that the examination should take place abroad, and this does not mean in the interest of the applicant alone as his argument seems to suggest. All the other claimants have an equal interest in the administration of justice . . . [T]hey have claims of their own, and may rightfully insist on the same scrutiny by cross-examination of appellant and witnesses supporting his claim as his counsel here may make of evidence offered in support of appellees' claims. What was said in one of the opinions quoted above would generally be applicable here: 'Justice requires that he [the party] should appear at the trial in order that his identity may be tested.' " (pp. 297-8).

Appellant in Garrett's Estate, like the exceptant here, raised the argument of a lack of due process. Our Supreme Court held that the contention lacked merit for the following reasons, which are just as applicable to the instant case: "In support of the argument the brief refers to requirements of notice and opportunity to be heard and to present evidence. These elements of due process have all been present since the death of testatrix; none is missing. Appellant might at any time after notice of Mrs. Garrett's death have appeared and taken necessary steps for making his claim. Even after his own delay, the learned court below heard and considered his application and in the exercise of the discretion vested in the court, concluded that appellant was not entitled to what he asked; he has not been deprived of any hearing . . . If he did not choose to avail himself of the opportunities for the periods of time stated, his loss was not the result of want of due process but his election not to proceed in time. To that, it is no answer now to say, after having waited from 1932 to 1937, that he found himself physically incapacitated. We all

agree that no abuse of discretion has been shown." (pp. 299-300).

What we have just quoted from Garrett's Estate is both material and relevant to a consideration of the mandate in Rule 4015(b) that commissions and letters rogatory "shall be issued only when necessary or convenient", and in our opinion fully disposes of all related questions. See 5 Anderson Pa. Civ. Pract., pp. 71-76, inclusive.

In Nace v. Neff College of Oratory, 46 Pa. Superior Ct. 237, 240, our Superior Court ordered a new trial because the lower court had admitted the testimony by deposition of a witness, resident 200 miles away, whose inability to attend the trial had not been proven. The appellate court based its order on its "conviction of the wisdom of the common-law theory that a witness speaks not merely by the words he utters, but by his eye, his tone of voice and all of those visible manifestations that are regarded as indicative of candor and intelligence or the lack of them."

In Martinzik Estate, supra, decedent died in 1950, and the Russian claimants were represented by Mr. Lawler's law firm together with the same New York forwarding counsel. This court, sitting en banc, rejected claimants' request for letters rogatory and in the course of our opinion (O. C. No. 587 of 1953, filed April 7, 1955, not reported) we said: "The United States objects to the issuance of letters rogatory in this case because the disposition of the assets in this estate would depend upon the credibility of the alleged next of kin, and the taking of their testimony by letters rogatory would deprive this Court of its opportunity to observe the demeanor of the claimants and to interrogate them, and would deprive the other parties to this case of the opportunity to cross-examine them.

"The ascertainment of truth as a prerequisite to the dispensing of justice is fundamental to our Anglo-

American system of jurisprudence. The privilege of cross-examination of witnesses, with the opportunity of watching their demeanor while testifying, is an inherent and long recognized essential in our procedure. From its observance spring our rules against hearsay testimony. Where exercise of the privilege is necessary for the protection of one party from the evidence produced by the witnesses of another party, a fortiori, is it needed in the case of the testimony of the opposing party himself."

What we said then bears repeating now. It is just as relevant now as it was then. Judgments and decrees in an American court must be preceded by findings of facts, and in compiling the official record the touchstone is ever *truth*.[1]

In weighing the hardship falling on this claimant because of her inability to present her case except by personal appearance before this court, we must not overlook the disadvantage at which our own citizens

---

[1] Not so in the U.S.S.R., however, where recent history records countless instances of judgment first, to be followed later by a Communist ukase of facts.

"The Communists invariably tell the 'truth', but it is the Marxist-Leninist 'truth.' Those who believe that the Communists will lie in the interests of Communism are mistaken. In fact, it is not possible for a Communist to lie in the interests of Communism. By definition, if a statement is in the interests of Communism, it is the truth.

"Jesting Pilate asked the question: 'What is truth?' Christians believe that God is Truth. Truth is a quality of God Himself. An absolute God created an absolute Truth. Truth is. The Communists affirm that this is nonsense. There is no God; there are no absolutes; everything is relative; Truth itself is a relative of the class struggle. Lenin said: 'The Communist Party is the mind, the conscience, and the morals of our epoch. Proletarian morality is determined by the exigencies of the class struggle.' Truth is a weapon of the class war, and any statement that advances Communist conquest is 'true.' We can trust the Communists always to say that which will advance Communist conquest. We can trust them always to tell the Marxist-Leninist 'truth'": You Can Trust the Communists (to be Communists) by Dr. Fred Schwarz (Prentice-Hall, Inc., 1960), p. 8.

would be placed if we should accept at face value documents or other forms of evidence coming out of the U. S. R. R. We should not be overly persuaded nor misled by the seals and certifications placed thereon by Soviet officials. The lawyer behind the Iron Curtain who gathers such evidence is not a free agent acting in the exercise of a free profession; he "is not a champion of private rights but an auxiliary agent of the State." [2] Furthermore, a *government* attorney may enter a civil suit at any stage of the proceedings "if, in his opinion, this is required for the protection of the interests of the state and the toiling masses." [3] In the instant case, revocation of the power of attorney given to Mr. Finkelstein by the later power given to the firm of New York lawyers who have consistently represented, through Mr. Lawler's firm, citizens of the U. S. S. R. before this court, is abundant evidence that the Russian govern-

---

[2] Government, Law & Courts in the Soviet Union and Eastern Europe by Gsovski & Grzybowski (Frederick A. Praeger, New York, 1959), p. 564. The dominance of the government and the complete subjugation thereto of all attorneys in the U.S.S.R. is startlingly portrayed in the practice of criminal law. The voice of the advocate for the accused may, at any moment, be silenced or drowned out by the same voice fervently proclaiming the undying loyalty of its conscience-stricken owner to the principles of Communistic socialism. "The late Vyshinsky in 1934 characterized the position of a defense counsel in court in the following very unfavorable terms: 'With us the [conduct] of the defense is, basically, merely tolerated and, in addition, endeavors are made to demonstrate, in all possible ways, contempt for the defense with the idea in mind that such an attitude towards the defense proves one's highest "revolutionarity".'

"Though not approving of this attitude, Vyshinsky nevertheless insisted that the first requirement which must be met by the defense counsel is that in presenting evidence in favor of a defendant he must proceed 'not from the interests of his client but from the interests of the building up of socialism, from the interests of our state.' In addition Vyshinsky required of the counsel for the defense a 'high feeling of political responsibility and high political qualifications.'" Op. cit., p. 561.

[3] Op. cit., p. 892.

ment, while not a party on the record, is, nevertheless, "enjoy[ing] all the rights of a party." [4] Such arbitrary government control of the litigation presages similar control of any funds that the claimant might receive, to the detriment of her own benefit, use and enjoyment thereof.

As an Orphans' Court we are charged with the statutory responsibility of properly distributing a decedent's estate. We cannot permit these eight residuary legatees, all residents of the United States, to be victimized by the agents of a foreign totalitarian power such as Russia. We believe that they have waited long enough to enjoy their inheritance which was bequeathed to them by the undisputed last will and testament of their friend, Michael Sochanczak. We are convinced that further delay is entirely unwarranted on this record and would be manifestly unfair to the named beneficiaries: Watkins v. Justice, 256 Pa. 37, 40, 41.

The exceptions filed on behalf of claimant, Anna Sochanczak, are dismissed, and the re-adjudication is confirmed absolutely.

---

[4] Op. cit., p. 892.