# Wingert's Estate.

*Wills—Issue devisavit vel non—Testamentary capacity—Undue influence.*

An issue devisavit vel non is properly refused where it appears that the testatrix when about eighty-seven years old distributed one third of her estate amongst her nephews and nieces, who were her nearest of kin, and all of whom lived in remote states, and with whom she had no close personal relations, and shortly thereafter executed the paper in controversy by which she divided the remainder of her estate among missionary and educational societies of a religious denomination to which she was devotedly attached, that testatrix was of perfectly sound mind at the time of the making of her will, was able and did manage her own affairs, and that the preachers of the denomination benefited while having knowledge of the testatrix's purpose did not urge her to the execution of it nor in any way fraudulently practice upon her.

Argued March 11, 1901. Appeal, No. 206, Jan. T., 1900, by Mahala Wengerd Cornelius from decree of O. C. Franklin Co., refusing an issue devisavit vel non in the estate of Lydia Wingert, deceased. Before McCOLLUM, C. J., MITCHELL, FELL, BROWN and MESTREZAT, JJ. Affirmed.

Appeal from register of wills.

JOHN STEWART, P. J., filed the following opinion:

Lydia Wingert was a single woman and at the date of the execution of the paper offered as her last will, was living by herself, in her own home, upon her own farm, without nearer kindred than nephews and nieces, all of whom lived remote from her, some in Ohio, some in Illinois and others in Michigan.

On December 31, 1891, she executed the paper in question; she survived four years and died December 10, 1895, at the advanced age of ninety years. Meanwhile she executed two codicils, one bearing date of March 11, 1893, and the other April 19, 1894.

The contestants are the kindred of Lydia Wingert; and since their interest in the estate, as defined in the original paper of December 31, 1891, is neither enlarged nor diminished by either codicil, our present inquiry concerns only the situation as the evidence shows it to have been about the time the original paper was executed. The codicils deal only with the part of the estate originally devoted to religious and charitable purposes, and even though these should be refused probate, yet if the original paper be established as a valid testamentary act, it is obvious that the contestants would be unaffected. They are interested parties, only as the validity of the paper of December 31, 1891, is called in question. The beneficiaries who are disappointed under the codicils, would be in position to contest these on the grounds advanced in the case, but they are not resisting, and we fail to see how others, not interested, can.

The contestants take their appeal from the register's decision on two separate grounds. They allege first that Lydia Wingert at the time of the making of the will in question, was not of sound and disposing mind, memory and understanding; and second, that the execution of the will was procured by undue influence. They ask that an issue be awarded to try and determine these questions.

As the case was argued on behalf of the contestants it resolved itself into a single issue. It was admitted, so at least we understand, that the allegation of want of testamentary capacity in testatrix, disconnected from the charge of undue

influence, could not be maintained; that the testatrix although enfeebled in body and with mental faculties somewhat impaired, if left free to act upon her own inclinations and judgment, had sufficient mind to make a valid testamentary distribution of her estate. The evidence on this branch of the case was not offered with a view to establish anything to the contrary, but in connection with and support of the second allegation, the purpose being to show a weakened mental condition that made her especially susceptible to the peculiar influence which it is alleged were exerted upon her, and which, it is claimed, substitutes another's will for hers. And indeed this is all that could be seriously contended for with respect to the evidence on this branch of the case. It discloses nothing upon which even a suspicion of mental weakness to an incapacitating degree, could rest. Not a single irrational speech or act is testified to, not a single situation is presented to which testatrix was not equal. At the period to which we refer and for a long time afterwards she was not only capable of managing her affairs, but she actually did manage them, and the evidence shows that she did so with at least ordinary prudence and judgment.

Her estate consisted of the farm on which she lived, such personal property as is ordinarily in use about a farm, and some money investments. It amounts in the aggregate to some $12,000 or $15,000 perhaps. In March or April prior to the making of her will, she distributed $4,000 of the estate among her kindred. The evidence suggests, if it does not persuade, that this was part of a scheme matured in the mind of testatrix and which was completed by the will of December 19 following. By this will she gives to each of her nephews and nieces an additional $100, and setting aside $1,500 the interest to be applied to the maintenance of the church graveyard, and the support of the minister of the particular congregation to which she belonged, she then divided the remainder equally between the missionary and educational societies of her church. It is safe to say that under this distribution two thirds of the entire estate is given to religious and charitable purposes.

Considering the situation of the testatrix, her associations, habits and inclinations, the remoteness of her kindred, as well in locality, as degree, and her want of actual personal acquaintance and intercourse with them, it can hardly be said that this

will is out of the ordinary; indeed it strikes us as just what might have been expected as the deliberate act of one so situated.

She was a woman of pronounced religious convictions and feelings, enthusiastic in her church life, and devoted to the denominational order to which she was attached. Kinship no closer than was hers, lacking the endearment that results from association and intercourse, would not strongly appeal, especially when other objects had become of deep and enthusiastic concern, and which in their nature suggested somewhat of religious duty. This circumstance is not to be overlooked in the consideration of the question before us, since the charge is that the paper does not express the mind of the testatrix, but is the expression of another's will which she was constrained to adopt as her own. As we view it, the contention here derives no support whatever from the will, that is to say from the particular disposition it makes of the estate; it must rest entirely and exclusively upon such evidence as is offered to show the exercise of undue influence; and inquiring into this, must necessarily precede any question as to the extent of testatrix's mental impairment, since if no undue influence be shown, whatever the degree of mental decline, it was admittedly short of that which would deprive of testamentary capacity, and the will must stand.

Confining ourselves to the period at and about December, 1891, we find from the evidence that testatrix was living in her own home, of which she was the absolute mistress, managing her own business, and accomplishing her own desires in her own way. She had few cares and no dependents, and possessed of an estate more than adequate for her personal wants, she was in a position to be generous and charitable. No object was anywhere so near to her as her church. She had given to it freely and frequently, unable because of physical infirmity to attend public worship, she required frequent pastoral visitations in her home, and in this way she came to know many of the clergymen of her church. Her house was open to them, and her appreciation of their ministration was met by a corresponding appreciation on their part of her kindness. To her they were the saints; while to them she was Lydia of Thyatira come again. That intimate social and personal relations should exist is not surprising, and that under such experience her at-

tachment to the church should grow stronger and her concern
for nephews and nieces, few of whom she had ever seen, and
with none of whom had she ever had but slight acquaintance,
should grow weaker, is just what was to be expected.  Yet it
is the frequent and intimate association with the clergy of her
church, their continual attendance upon her, and her marked
confidence in and liberality towards them, which has given rise
to the present charge of undue influence.  The allegation is
that these gentlemen, with a view to advantage the church to
which they belonged, so practiced upon the religious feelings
and convictions of the testatrix, that her freedom of will was
overcome, and she was constrained to make her will in accord-
ance with their suggestions and desires.  A number of wit-
nesses, including several ministers, who it is to be remarked
are attached to that wing of the divided church which found no
favor with the testatrix, and which was discriminated against
in her will, give it as their opinion, that testatrix from the year
1891, until her death, was in moral subjection to the preachers
who visited her and were about her, and although entirely sane,
yet that her mind and character had so far changed that she
was without sufficient will power to resist importunity from
them.  So far as we can discern this opinion, which they give
without reservation or qualification, is based solely on the fact
that she gave occasional benefactions to the preachers them-
selves, and on several occasions sums of money to the church.
If it be true that she was powerless to resist their demands,
their moderation is a tribute to their modesty and unselfishness,
and suggests at least an unwillingness on their part to abuse
the power they had.  For considering her estate and situation
in life, her gifts whether to the preachers or the church, were
far from prodigal.  In not a single instance where the opinion
is expressed, do we find it supported by facts which would lead
an impartial man to any such conclusion.  On the contrary the
evidence we think clearly shows, that this old lady had a will
of her own sufficiently strong and assertive to order her affairs
to her own liking.  Repeated instances are related by the wit-
nesses, where she yielded her views to arguments which would
have been convincing to an intelligent and reasoning mind, but
not a single instance is given where she surrendered either to
importunity or threat, if we except that testified to by Mrs.

Sheely, the wife of the tenant who was discharged. The testimony of the witness if it has importance applies to another branch of the case, which we are about to consider.

Even though the state of the old lady's mind was as contended for, and her subjection to the influence of the preachers be established, a most material part of the case remains to be made good. Granting that she had not sufficient power to assert her own will against the will of her clerical friends, what evidence is there that the latter, or any of them, by word or act interfered in the remotest way to control the final disposition of the old lady's estate? Upon what facts could a verdict against the will on any such ground be rested? We would have the will with its provisions from which no prejudicial inference could be drawn, and the further fact, if we concede the first contention that the preachers had it in their power to influence the old lady, but where is the evidence that this power was ever exerted even in the slightest degree, except it be found in the testimony of the single witness just referred to.

According to the statement of the witness the testatrix had by an earlier will given $1,500 to the support of the minister of the particular congregation to which she belonged. Later on she thought this was excessive and when she was distributing the $4,000 to her kindred, she required her nephew who was assisting in the business, and who was himself a minister in the same denomination, to write her a codicil in which she reduced the legacy to $900. Some days after, when "she appeared to be in awful trouble" she told this witness that she had restored the original amount, because as she said "the preachers said she would have to change that and make it $1,500 again." This, it will be observed, was in connection with a former will, which the old lady herself revoked and destroyed. If this testimony is to be believed it goes to show that the preachers were concerned about the old lady's will, and also that they had a certain amount of influence over her which they exerted. But the evidence stands alone unsupported by the general facts of the case, and in so far as it suggests coercion or constraint by the apparently "awful trouble" the testatrix was in at the time, it is wholly inconsistent with her admitted composure and satisfaction later on when she has given to the church, not simply an increase of $600 as be-

fore but three fourths of her entire estate. This later and larger gift never seems to have troubled her at all, although she survived for years thereafter. We have carefully searched the record to see if there is any other evidence connecting the preachers with the testamentary act, and we are quite confident that on contestant's side there is none. Whatever evidence there is of their action participating beyond what has been referred to is to be found in the testimony taken on behalf of proponents. A careful and particular review of the testimony of these witnesses is not required. It shows that she acquainted the presiding minister of the district with her purpose to make a will, and devote her entire remaining estate to the church and its work, that at her request he engaged Mr. McLanahan, a most reputable gentleman of this bar, to call and see testatrix with reference to her will and to prepare it for her; that the will was written by Mr. McLanahan as it was dictated to him by testatrix, and that after its execution it was placed in his custody, where it remained continuously except as it was recalled for the execution of the codicils, until her death. The evidence on this side shows knowledge on the part of the preachers of testatrix's purpose in advance of the execution of the will; but convicts them of nothing that has the slightest taint of unlawfulness in it. They might with safety, we will not say with propriety, have gone further than they did. We find no evidence of suggestion or encouragement on their part and yet both would have been lawful, for it is "only where influence is unduly exerted over the very act of devising so as to prevent the will from being truly the act of the testator that the law condemns it as a vicious element of the testamentary act:" Dean v. Negley, 41 Pa. 312. "Lawful influence," says the same authority, "must be allowed to produce its natural results, even in influencing last wills."

It is impossible to read the evidence and conclude either that there was a mentally weak and infirm old lady, or that the will propounded was anything but her own deliberate act and the expression of her own free will. There may be room for suspicion that she found encouragement in the advice of clergymen, in whom she trusted, and in their approval of her schemes; but there is positively nothing that gives support to the charge

that she was under the domination of others, or was fraudulently practiced upon in this her testamentary act.

In reaching this conclusion we have had regard to all the evidence in the case, as well that which refers to the codicils and the period in which they were written as that which relates more particularly to the circumstances connected with the original will; though as we said before it is the original will only that concerns these contestants.

Being of opinion that a verdict against the will could not be sustained on the evidence now before us we cannot entertain this appeal.

And now, January 9, 1900, appeal dismissed at cost of appellants and issue refused.

*Error assigned* was decree dismissing appeal from register.

*Walter K. Sharpe*, with him *O. C. Bowers*, for appellant, cited : Sharpless's Est., 134 Pa. 250 ; Knauss's App., 114 Pa. 10 ; Herster v. Herster, 116 Pa. 612 ; Miller's App., 179 Pa. 645 ; Yardley v. Cuthbertson, 108 Pa. 395.

*W. U. Brewer*, *A. G. McLanahan*, *A. C. Strite* and *J. A. Strite*, for appellees, were not heard.

PER CURIAM, May 27, 1901 :

It was alleged in the petition for an issue devisavit vel non that Lydia Wingert was not of sound disposing mind, memory or understanding at the time of the execution of the papers which were supposed to constitute her will, and that said papers were procured by undue influence exercised by Jacob W. Clair, Henry Strock and other persons to the petitioner unknown. The evidence presented by the petitioner in support of her claim that the testatrix was wanting in testamentary capacity was not sufficient to invalidate her will, and this was conceded by the contestant. The evidence also failed to show the exercise of undue influence by the parties to whom petitioner imputed it. It seems to us, from a careful examination of the testimony in the case, that the court below did not err in refusing the issue petitioned for. In a clear, concise and satisfactory opinion

Judge STEWART held that there was no warrant in the testimony for the issue applied for.    We therefore affirm the decree on said opinion.

Decree affirmed at the cost of the appellant.