## Frazier Estate

Before Sinkler, P. J., Klein, Bolger, Hunter, Boland and Lefever, JJ.

*Drinker, Biddle and Reath,* for exceptants.

*William Carson Bodine* and *James A. Montgomery, Jr.,* contra.

*Robert E. Woodside,* Attorney General, and *Irving N. Kieff,* Deputy Attorney General, for Commonwealth.

LEFEVER, J., June 22, 1951.—The issue in this case is the jurisdiction of the Register of Wills of Philadelphia County over the estate of Mary Fuller Frazier, deceased. Contestants contend that the letters testamentary granted by him to Thomas Stokes, Esq., and Fidelity-Philadelphia Trust Company should be revoked and the estate sent to Connecticut for administration and determination of all legal problems.

Testatrix was born in the small town of Perryopolis, Fayette County, Pa., on June 26, 1864 (or 1870). She was married to, and divorced from, two successive husbands, namely, Louis P. Posey, M.D., of Pittsburgh, Pa., and J. Miller Frazier, of Philadelphia, Pa. She spent most of her life in Pennsylvania, with the exception of relatively short periods during which she lived in various cities in California, Kentucky, Nevada, Connecticut, New York and France. She built or purchased a number of homes. She lived in some of these homes; others she abandoned before completion. In 1946 she acquired a property in Ridgefield, Conn., where she lived until January 12, 1948. On that date she abandoned this residence and entered the Leroy Sanitarium in New York City, en route to a new home she was building in suburban Philadelphia. She died in the sanitarium on August 6, 1948, leaving an estate of approximately $2,000,000.

Throughout her lifetime her financial interests were centered in Philadelphia; her affairs were handled by various Philadelphia banking institutions, and she was almost always represented in legal matters by members of the Philadelphia bar. The record contains copies of a series of eight wills and three codicils exe-

cuted by testatrix from October 1937 to July 28, 1948. Either Arthur Littleton, Esq., or Thomas Stokes, Esq., of Philadelphia, prepared all of these but the will of June 27, 1946, which was drawn by Ralph E. Cramp, Esq., of Ridgefield, Conn. Each of these wills contains elaborate and almost identical directions for the burial of testatrix "in the Fuller Mausoleum in Mount Washington Cemetery, near Perryopolis", and provides substantial gifts either directly to the town of Perryopolis, or "for public, charitable, literary or educational purposes in the town of Perryopolis". In none of these testamentary writings is there any reference made to, or any gifts given to, any of the contestants, although there are many bequests in each will.

On August 16, 1948, testatrix's will, dated October 27, 1947, and codicils thereto dated April 22, 1948, and July 28, 1948, were admitted to probate before the Philadelphia Register of Wills, and letters testamentary thereon were granted to Fidelity-Philadelphia Trust Company and Thomas Stokes, Esq. Thereafter, ancillary letters testamentary were granted in Connecticut. Pursuant to a settlement with the Connecticut taxing authorities, inheritance taxes were paid in that State, the Connecticut assets were liquidated, and the proceeds were transferred to the Pennsylvania executors.

The first account of the Pennsylvania executors was called for audit before Judge Boland on September 21, 1949. On that date, contestants appeared by their Philadelphia counsel and requested a continuance "basing it on the fact that he intended to file an appeal from the register". No prior formal action of any kind had been taken by contestants during the 13 months following the death of testatrix, during which the executors proceeded with the administration of the estate.

On September 29, 1949, contestants "filed their appeal from the decree of the register" and filed a petition for issuance of a citation to show cause why their appeal from the register "should not be sustained and the decree of the register set aside and an issue directed to try the following question of fact: (1) whether or not the decedent was domiciled in Pennsylvania at the time of her death". In support of this petition contestants alleged that they were first cousins of testatrix; ". . . that at the time of the death of decedent she was a resident of and domiciled in the State of Connecticut, and that said decedent was not a resident of or domiciled in the Commonwealth of Pennsylvania, and that, consequently, the Register of Wills of Philadelphia County has no jurisdiction to admit the writing to probate . . . nor . . . to award letters testamentary . . ."; and ". . . that your petitioners believe, and expect to be able to prove that, at the time of the execution of said writings, the physical and mental condition of the decedent were greatly impaired by sickness and infirmity, and that she was not a person of sound mind, capable of disposing by will of her estate under the laws of the State of Connecticut." The citation was granted and served, and proponents filed an answer denying these allegations. Hearings were held before Judge Boland on January 30, February 27 and 28, March 1 and 9, and April 12, 1950.

The testimony developed that the real contestants are Minnie P. Martin and Guy Fuller Martin, children of Letitia Strickler, allegedly a sister of testatrix's mother; and Grace E. Meredith, Forrest H. Strickler, Harry A. S. Strickler, and Emma Mae Strickler (who died in September 1949), children of Alexander Hamilton Strickler, allegedly a brother of testatrix's mother. Of these alleged first cousins, Forrest H. Strickler was the only one who appeared at the trial. None of them attended testatrix's funeral. In fact,

they did not "know that she was dead for a few days until we seen it in the paper". None of these alleged first cousins *ever* saw or communicated with testatrix except Emma Mae and "the last time Emma Mae communicated with her was before 1900".

Contestants introduced evidence with regard to the alleged relationship between themselves and testatrix. They also presented considerable evidence on the subject of her domicile, particularly from 1946 to the date of her death. However, contestants failed to produce one scintilla of evidence: (a) As to the testamentary capacity of testatrix on the dates on which she executed the will and codicils probated by the register, or at the time she executed any of her prior wills, each one of which successively was revoked by the revocatory clause in the next succeeding will, or (b) as to the law of Connecticut on the subject of execution of wills and the requirements for testamentary capacity. The hearing judge and counsel for proponents repeatedly called the attention of contestants' counsel to this omission. Proponents' attorneys even offered to introduce evidence to show that testatrix had testamentary capacity at the time she executed the successive wills and codicils, but contestants' counsel objected. The hearing judge ruled that contestants "are not pressing that and I am assuming that she had capacity". "As I understand it, they [subscribing witnesses] have taken the witness' oath to the probate of this will and that is a presumption of testamentary capacity." No exceptions were taken to this ruling.

The learned hearing judge, in an exhaustive and well-considered opinion, concluded: "Contestants have not shown, and I so find, a relationship either under the laws of Pennsylvania or Connecticut". In reaching his conclusion, he gave little weight to the testimony of Forrest H. Strickler and he ruled inadmissible as evidence the book, "Stricklers of Pennsylvania", writ-

ten by Abigail H. Strickler and Mame E. Strickler (who concededly were not related to contestants or testatrix except as collateral members of the Strickler family), published by the Strickler's Reunion Association of Pennsylvania in 1942.

The testimony of Forrest H. Strickler was inaccurate, evasive and vague, and at points even false. As appears from the testimony quoted in the hearing judge's opinion, Strickler was untruthful with respect to his contingent fee contract with Bales and Mr. Berg. The credibility of witnesses is for the determination of the hearing judge. It is our opinion that the hearing judge would have been justified in completely disregarding all of the testimony of this witness because of his evasiveness and untruthfulness with regard to the manner in which contestants were persuaded to become litigants in this case, and their contracts with Bales and their various lawyers.

The information contained in the book, "Stricklers of Pennsylvania", was clearly hearsay and not admissible because the authors were alive and, therefore, presumably could have appeared at the hearing. Moreover, there were a number of patent errors in the book which were brought out on cross-examination and to which the hearing judge made reference. Forrest H. Strickler frankly conceded that "There are probably lots of mistakes in that book." The burden of proof in this case was upon contestants. There was no obligation on the part of the hearing judge to sort out those portions of this book which might be entitled to credibility and use them to establish contestants' case.

Contestants' case, minus the testimony of Forrest H. Strickler and the book, "Stricklers of Pennsylvania", is weak, at best.

"In either event we are faced with numerous discrepancies and shortcomings in the evidence and when they are considered it becomes apparent that appel-

lant's claim was properly dismissed. The burden is always upon a claimant to prove kinship to a decedent by a fair preponderance of the credible evidence . . .": Davis Estate, 365 Pa. 605, 607 (1950).

The learned hearing judge has carefully analyzed the evidence in this case on relationship and there is no need for us to repeat that here. Suffice to say, we find nothing in the record to warrant our concluding that his finding was either an abuse of discretion or contrary to the weight of the evidence. As stated by the late Chief Justice Kephart in Link's Estate (No. 1), 319 Pa. 513, 522 (1935), the leading Pennsylvania case on proving heirship: "When a hearing judge refuses to believe the testimony of a witness, his conclusion as to credibility will not be disturbed unless his acts are biased, capricious or unreasonable." We conclude, therefore, that contestants have failed to carry the burden placed upon them of proving that they were first cousins of testatrix.

We might well rest our decision here. However, there are other compelling reasons which require us to dismiss the exceptions in this case.

Throughout this case contestants have taken the position that all they needed to do was to show: (a) Their blood relationship of first cousins to testatrix, and (b) facts suggesting that testatrix was domiciled in Connecticut rather than in Pennsylvania at the time of her death. They urge that proof of the foregoing is sufficient to require this court to revoke the grant of letters testamentary by the Philadelphia Register of Wills and to refer the case to the Connecticut courts. The cases cited by contestants are those where the mere ousting of jurisdiction of the court of the forum ipso facto vested an immediate right to the estate in contestants, e.g., cases in which the will, although executed properly under the law of the forum, was improperly executed under the law of the foreign

jurisdiction, and the court's decision that testatrix was domiciled in the foreign jurisdiction automatically invalidated the will. However, we know of no case where the court revoked letters testamentary on a mere showing of relationship without more. Per contra, the cases indicate that contestants who challenge the validity of a will must prove that they would be entitled to participate in the enjoyment of the estate of testatrix if the will before the court be ruled invalid (Ash Will, 351 Pa. 317 (1945)) ; otherwise, contestants are not "parties in interest" who have a standing to contest the validity of the will. See Curtis' Estate, 253 Pa. 389 (1916) ; McCarty Will, 355 Pa. 103 (1946) ; Wingert's Estate, 199 Pa. 427 (1901), and Cahill's Estate, 21 Dist. R. 660 (1912).

In Knecht's Estate, 341 Pa. 292, 297 (1941), the Supreme Court, of its own motion, dismissed an appeal from the register of wills, on the ground that appellant was not an *interested party*, stating:

" 'The register of wills being a judicial officer, admitting a will to probate and granting letters testamentary thereon being judicial acts, the judgment must stand as final against all except those who have a right to contest it by appeal therefrom. . . .' "

In Gressel et al. v. Bailey et al., 363 Pa. 614 (1950), two sons and two grandsons brought a bill in equity against decedent's daughter to set aside a conveyance of real and personal property to the daughter by decedent, on the grounds of fraud. Decedent's will, which named the daughter as residuary legatee and devisee, had been lodged for probate and a caveat entered. The Supreme Court dismissed the appeal *for lack of standing of appellants*, stating per Mr. Justice Stearne, at pages 616 and 617:

"There exists a barrier to our consideration of this appeal. *Plaintiffs' only interest is that of heirs of decedent.* They possess no status, at this time, to insti-

tute and prosecute this action. If the relief sought in the bill should be granted, the real and personal property in litigation would necessarily form part of the decedent's estate. By the will, lodged with the register of wills for probate (with its probate prevented by plaintiffs' notice of caveat), decedent's residuary estate is devised and bequeathed to the defendant daughter. Such daughter, therefore, is presumptively the owner as devisee and legatee under the will until or unless the will is set aside. It follows that unless and until the will is declared invalid, the present plaintiffs lack the status to institute this proceeding."

In the instant case contestants have failed to present any evidence whatsoever as to the law of Connecticut on the subject of execution of wills or the requirements of testamentary capacity for the execution of wills. The law of a foreign jurisdiction is a question of fact which must be proved as any other fact. The law of Connecticut is presumed to be the same as that of Pennsylvania since contestants failed to introduce any evidence to the contrary: Commonwealth ex rel. Schnader v. National Surety Company, 349 Pa. 599 (1944) ; General Motors Acceptance Corporation v. Foley, 311 Pa. 477 (1933). The will and codicils in question were properly executed in accordance with Pennsylvania law. In this State the burden of proof rests upon contestants to show that testatrix did not have testamentary capacity at the time of the execution of the will in dispute. No evidence whatsoever has been presented on this vital point. Therefore, as ruled by the learned hearing judge during the course of the hearing, testatrix is presumed to have had testamentary capacity on the dates upon which she executed the will and codicils. No exceptions to this ruling have been filed by contestants and they are accordingly bound by it.

It is significant that testatrix had one general testamentary scheme with regard to the disposition of the

bulk of her estate, consistently provided for in every will that she executed throughout a period of at least 11 years prior to her death, namely, the improvement, aid and assistance, socially and economically, of her birthplace, the town of Perryopolis, and the institutions connected with it. She likewise had a fixed purpose with regard to her burial and the maintenance of the family mausoleum in Perryopolis, which remained constant throughout the various wills. The same corporate executor and many of the same pecuniary legatees were designated in will after will. It is most significant that the wills and codicils executed during those 11 years were drawn by leading lawyers, whose names are well known not only in Philadelphia but throughout Pennsylvania. Implicit in a lawyer's oath of fidelity to the court is his duty not to draw, or to countenance the execution of a will by a person who he knows lacks testamentary capacity. It is inconceivable that lawyers of such renown and integrity as these would have been engaged over a period of years in the nefarious and persistent scheme of assisting this testatrix in executing successive wills, if she obviously lacked testamentary capacity. Their participation in the preparation and execution of these wills created, if not a presumption, at least a strong inference, in favor of the mental capacity of this testatrix and the validity of these wills. In contrast, contestants rest their case on their bare unsupported allegation that "at the time of execution of said writings, the physical and mental condition of the decedent were greatly impaired by sickness and infirmity, and that she was not a person of sound mind, capable of disposing by will of her estate . . .". They overlook the fact that even if the will and codicils now before the court were invalid by reason of testatrix's lack of testamentary capacity, the next preceding will would be automatically reinstated because not only the current will itself but the revocatory clause therein

would fall if it were invalid for lack of testamentary capacity. A fortiori, the validity of each succeeding prior will would be in issue and the burden would fall on contestants to show lack of testamentary capacity of testatrix at the time she executed each will. Contestants have failed to make any allegations with regard to this. This in itself may be a fatal defect in contestants' case. In any event, they have totally failed to present any proofs on the subject.

Contestants have not demonstrated that they are interested parties in this litigation. This court does not sit to decide moot points, but to give relief to interested parties who show that they are entitled to it. No such showing has been made here.

In view of these conclusions, it is unnecessary for us to decide the question of domicile. However, we note in passing that the voluminous record in this case strongly indicates that testatrix never abandoned or lost her Pennsylvania domicile of origin. Throughout her life she manifested an intense interest in and attachment to Pennsylvania and her birthplace, Perryopolis. In countless legal documents and on numerous occasions she referred to herself as "of Philadelphia, Pennsylvania". Like many other wealthy persons, particularly those plagued with domestic difficulties, she roamed over the world and temporarily resided from time to time in many cities throughout the United States, and abroad. However, she almost invariably referred to Pennsylvania as her home. In January 1948 she left the only house outside of Pennsylvania which might have reached the dignity of a domicile of choice. Even this palatial house in Ridgeway, Conn., fell short of domicile. Only a few rooms were furnished. Rugs *in rolls* were in evidence throughout the house and were never finally laid. There were many other indications that testatrix never became permanently settled in this house. On January 12, 1948, she closed her

Connecticut house, placed it on the market for sale, sold all her personal belongings and furnishings therein contained, discharged her servants, notified the tax collector she no longer resided in Connecticut, bought a lot in suburban Philadelphia, had plans for a home drawn by an architect, made a contract with a builder to erect a home theron, executed a codicil authorizing her executors to complete the new house even though she died in the interim, and was looking forward to moving into that new home about Christmas time. She left Connecticut, and stopped in New York at the Leroy Sanitarium for treatment en route to Philadelphia. This terminated her temporary residence in Connecticut. Her illness became serious and extended her stay in the hospital. There she died.

"It requires less evidence to prove the continuation of domicile than it does to establish a new domicile . . . it is an established principle that domicile, having been shown to exist, is presumed to continue until another domicile is affirmatively proven": Pusey's Estate, 321 Pa. 248, 265 (1936). It appears, therefore, that testatrix never lost her Pennsylvania domicile of origin.

Even if it be assumed that testatrix did establish an acquired domicile in Connecticut, under the "renvoi" theory she reverted to her native domicile of Pennsylvania on January 12, 1948, when she left Connecticut.

"A domicil once acquired remains until a new one is acquired actually, *facto et animo*. . . . There is one recognised exception to this rule, which is that the domicil of birth easily reverts, and therefore if a man has acquired a new domicil different from that of his birth, and he removes from it with an intention to resume his native domicil, the latter is re-acquired, even while he is on his way, *in itinere;* for the native domicil reverts the moment the acquired domicil is given up with the intention of resuming the former": Reed's Appeal, 71 Pa. 378, 383 (1872).

As this court ·observed through Judge Penrose in Bremme's Estate, 2 Dist. R. 455 (1893) :

" 'The domicil of origin always remains, as it were, in reserve, to be resorted to in case no other domicil is found to exist: . . . Hence, whenever a person in fact abandons a domicil of choice, without actually acquiring a new domicil of choice, his domicil of origin is always resumed; for either he resumes it as a matter of fact, or if he does not do so in fact he is .assumed by a rule of law to resume or re-acquire it:' Dicey on Domicil, 92, 93."

It is to be noted further that most of testatrix's assets were in Philadelphia. The register of wills "of the county where the principal part of the goods and estate of decedent within this Commonwealth shall be" has jurisdiction to probate the original will of a nonresident of Pennsylvania and to grant original letters testamentary thereon: Section 4 of Register of Wills Act of June 7, 1917, P. L. 415; II Hunter's Pennsylvania Orphans' Court Commonplace Book 1129; Harding's Estate, 12 D. & C. 633 (1929), and Shafer Estate, 67 D. & C. 495 (1949).

Since the bulk of testatrix's assets are located in Pennsylvania, ". . . this is not a question of jurisdiction, but merely one of judicial discretion. The right to retain the fund, and the jurisdiction to distribute it among the parties entitled, undoubtedly exist in the tribunals of the country under whose authority it was collected. . . . From these authorities it is clear that the Orphans' Court had a right to exercise its discretion in deciding whether it would distribute the fund itself, among the parties entitled to it, or remit it to the forum of domicil for the purpose . . .": Dent's Appeal, 22 Pa. 514, 520 ‚(1854) ; see also Bertin's Estate, 245 Pa. 256 (1914).

Only for compelling reasons will we send assets to a foreign jurisdiction for distribution and determina-

tion of the intricate legal problems connected with it. No such reason here exists to send the substantial Pennsylvania assets of this native Pennsylvanian to Connecticut at the request of alleged relatives whom she never knew, and who apparently were never on Connecticut soil. On the contrary, we should exercise our discretion to retain jurisdiction over these assets and to supervise their distribution to the end that the careful plans of testatrix to benefit the Pennsylvania town of Perryopolis be consummated.

Subsequent to the filing of the adjudication in this case, contestants filed a petition with the hearing judge for leave to introduce further evidence on the subject of their alleged relationship to testatrix. This he denied on the ground that he had afforded contestants ample opportunity to prove their case and that the suggested evidence was not after-discovered evidence. Contestants except to this ruling.

At the argument before the court en banc contestants filed a second petition for rehearing, stating that at such rehearing they proposed to introduce into evidence the record in a partition proceeding in Fayette County Orphans' Court in the Estate of Jacob Strickler, no. 53, December court, 1881. Subsequently, contestants filed an amended petition to which was attached extracts from this record. Contestants aver that the aforesaid record conclusively establishes the claimed relationship of first cousin between themselves and testatrix.

We sustain the ruling of the hearing judge denying the first petition for rehearing, and contemporaneously herewith dismiss the amended second petition for rehearing for the four reasons which follow:

1. Even assuming contestants' proofs were sufficient to show that they were first cousins of testatrix, this case is fatally defective as hereinbefore stated.

2. The suggested evidence is not "after-discovered" in the real sense of the term. The old box containing

the 1891 letter from W. H. Hopkins, the partition proceedings, and the other "additional" evidence were apparently all available to contestants during the protracted hearings in this case, and contestants could have discovered them in time for presentation during those hearings. Moreover, the amended second petition is fatally defective in that it fails to allege that the foregoing evidence was not available, and to allege a valid reason why it was not heretofore produced. Therefore, there was no need to afford proponents an opportunity to file an answer thereto although they requested permission to do so.

3. This case has already been overdelayed. A number of the pecuniary legatees are people of advanced age. Many of them are in need. The wishes of testatrix as to them will be defeated if this case is further delayed.

4. This is a clear case of solicitation and champerty.

When Judge Boland inquired of Forrest H. Strickler, "Tell us how you got in communication with the lawyer [Otto Berg of Chicago]. In other words, did he come to you or did you go to him, or what?" the witness fenced with the hearing judge, evaded answering the question, and finally over the strong objection of his counsel to this searching and pertinent inquiry, answered as follows:

"Q. Don't you want to tell us?

"A. I think I have told all I ought to or I have been compelled to do. . . .

"Q. I think you ought to answer that question. I am not going to compel you, but I am going to be guided by what you do. I am not going to wait any longer either, and I have waited a long while for the answer. . . .

"A. Well, Mr. Berg sent Mr. Bales down to look the situation over.

"Q. He sent Mr. Bales from Chicago?

"A. Yes.

"Q. To see you people?

"A. Yes.

"Q. Who is Mr. Bales?

"A. He is an investigator for lawyers.

"Q. So Mr. Bales came to see you.

"A. Yes. . . .

"Q. Did you know Berg and did he know you, and did you send for Berg and ask him to send an investigator to see the case? I am not telling you what to say, because I do not know what your answer is. I want to know who Berg is and did you know him before.

"A. No, I didn't know him before.

"Q. Did you send for him?

"A. No.

"Q. Mr. Bales came down to your neighborhood and said he was from Mr. Berg, didn't he?

"A. Yes.

"Q. And eventually they wanted to find out if you hired Mr. Berg to take your case?

"A. Yes.

"Q. You did not know you had a case before Mr. Bales came?

"A. Yes.

"Q. Did you send for Bales?

"A. No.

"Q. Did you go to your own lawyer in town?

"A. I talked to a few people.

"Q. Are you telling me now that Berg came down of his own initiative and talked to you people? That is what I want to get at. You did not send for Berg?

"A. No.

"Q. Who told you about Berg, Mr. Bales?

"A. Yes. . . .

"By Mr. Bodine:

"Q. Now, Mr. Strickler, . . . I think you said the first thing that happened was that a Mr. Bales came to see you from Chicago?

"A. Yes. . . .

"Q. Was any paper signed at that time?

"A. . . . They asked me if it was right that my name was Strickler, and had that notarized, and that was all there was to it. . . .

"Q. Then I think the next thing you said chronologically was that it was at Mr. Bales' suggestion you went to see an Otto Berg, an attorney, in Chicago?

"A. Yes, sir. . . .

"Q. What is your agreement with Mr. Bales?

"A. That if after all his investigation and the trials, if he wins the case for us—his lawyers win the case for us—he is to get 25 percent.

"Q. Are you to pay any of the expenses—I do not mean lawyers' fees—I mean traveling expenses, various court costs and things of that kind if you lost the case?

"A. No, sir."

The written contract Bales solicited and obtained from contestants, dated September 10, 1948, provides that Bales shall make a "thorough investigation" at *his* own expense and contestants "agree to pay C. A. Bales in full for his services and expenses a sum equal to Twenty-Five (25%) Percent of whatever we may collect. . . ."

Champerty may be defined as the unlawful maintenance of a suit in consideration of some bargain to have a part of the thing in dispute or some profit out of the litigation. Maintenance is an officious intermeddling in a suit that in no way belongs to one, by maintaining or assisting either party with money or otherwise, to prosecute or defend it. An agreement by a stranger to defray the expenses of a suit in which he has no interest or to give substantial support and aid thereto in consideration of a share of the recovery or the proceeds thereof is condemned by the courts as champertous: Waychoff et al. v. Waychoff, 309 Pa. 300

(1932) ; McIlwain's Estate, 27 D. & C. 619 (1936) ; "Champerty and Maintenance", 14 C.J.S. 356 and 366.

This litigation was instigated and fomented by Bales, a professional heir-hunter. He undertook to bear all expenses of investigation and litigation of the instant case, with the possible exception of court costs. In return, he received a contract calling for delivery to him of one fourth of this large estate, if the litigation so instigated were successful. Bales' task was not merely that of seeking heirs who, upon bare proof of relationship to decedent, were entitled to share in an intestate estate. Bales' task in this case was: (a) To discover blood relatives of testatrix who would be entitled to share in her estate if the intestate laws were applicable, and (b) to build up a case beyond that, namely, to prove lack of testamentary capacity upon the part of testatrix at the time she executed the will and codicils in suit and also at the time she executed the prior seven wills, which had been drawn by the above-mentioned distinguished scriveners over a period of 11 years. It is noteworthy that Bales was convicted in or about 1936 in Cook County, Ill., of obtaining money from the clerk of the Circuit Court of Cook County by fraud and by false pretenses, and of conspiracy to obtain said money; and he was sentenced to the penitentiary therefor. (Contestants' Philadelphia counsel frankly informed us of Bales' criminal record at the argument and stated that the existence of this record had just been brought to their attention.)

The solicitation and champerty in this case are patent. Although the solicitation was by a layman, Bales, it resulted in this case reaching the office of Otto Berg, Esq. The testimony implies that Bales was a regular member of Mr. Berg's staff or at least in some relationship whereby Bales regularly solicited cases for him. In face of the damning testimony of Forrest H. Strickler as to the origin of this case and the connec-

tion between Bales and Mr. Berg it was incumbent upon contestants to clear Mr. Berg if the facts are other than we have inferred. We have the highest respect for, and confidence in, the integrity of contestants' learned Philadelphia counsel. However, we cannot agree with them that Bales' agreement with contestants was "a perfectly proper contingent fees contract". There can be no question that local counsel were unaware of the champertous origin of this case or of Bales' criminal record when the case was forwarded to them by Otto Berg, Esq., of Chicago, and they accepted it; however, this does not purge the impropriety of Bales' conduct or any like impropriety on Mr. Berg's part. The taint connected with the origin of this case followed it throughout the hearings, as is apparent from the evasiveness and actual untruthfulness of Forrest H. Strickler (the key contestant) on the witness stand. The vice in Bales' conduct is clearly stated by Judge Stern (now Mr. Justice Stern) in Morgan v. Doe, 16 D. & C. 314 (1932) and quoted in Waychoff et al. v. Waychoff, supra, at page 307:

" 'Moreover, laymen are not bound by any professional oath or discipline, nor by the exalted sense of honor which comes from membership in a fraternity whose aim is the lofty one of the pursuit of justice, and, when they have a contingent interest in the spoils of litigation, they are more apt to suborn perjured testimony and to instigate corruption.' " See also the Estate of William Galvin Butler, Deceased, v. Walter C. Cox, 29 Cal. (2d) 419, 177 P. (2d) 16 (1947) (where the solicitation of cases by a "probate researcher" or "heir-hunter" was castigated on the ground that he "becomes a 'middleman' intervening for profit in the conduct of legal proceedings") ; and the annotation in 171 A. L. R. 351, where cases are collected in which courts have condemned the practice of solicitation of cases by heir-hunters. Although champertous origin of litigation

may not defeat a valid and clear legal right, it can and should be considered by us when, as here, contestants request us to exercise our equitable powers on their behalf. As stated in Ames v. Hillside Coal & Iron Company, 314 Pa. 267, 272 (1934), "champerty, repugnant to public policy, is still ground for denying the aid of the court".

We would be derelict in our duty were we to lend the aid of this court to contestants in this litigation, so begun and so fostered. We disapprove of the methods used in this case and will do everything in our power to discourage such litigation.

The exceptions and amended second petition for rehearing are dismissed.