## Surmach's Estate

*C. W. Martin,* for accountant.

MATTHEWS, P. J., April 2, 1943.——. . .

Decedent resided in the mining town of Leisenring No. 3, or Monarch, in Dunbar Township, for a period of over 15 years prior to his death. He was unmarried and had no known heirs or kindred. He lived at different times in three separate houses owned by the H. C. Frick Coke Company by whom he was employed while he was able to work. He lived alone, except that for a period of time prior to July 8, 1940, one Simon Zweiblia resided in the same dwelling, but in a separate room and apart from decedent. Simon was taken to the hospital on July 8, 1940, thence to the county home, where he died a few months later.

Decedent received the sum of $2.90 per week from the Department of Public Assistance of the Commonwealth of Pennsylvania from June 1937 to October 1938, $3.90 per week from October 1938 to March 1940, and $20.70 per month from March 1940 to December 1940, or a total of $691.80. He repaid $159.94, leaving a balance owing of $531.86.

He was indebted to his landlord, who was also his employer, in the sum of $389.10 for rental, but the greater part of this amount is for the depression years prior to 1936. Mrs. Susan Benya, a neighbor, looked after decedent during his last illness, or from about November 1, 1941, until his death on January 12, 1942. She furnished his meals during that time, cared for him in other ways, and makes a claim for $149.65. No party in interest objected to her explaining the services rendered by her and she is corroborated to some extent by other witnesses. The claim appears to us to be reasonable and proper.

On learning of the death of decedent, one Elizabeth Soxman, a clerk in the store of the Union Supply Company at Leisenring No. 3, called by phone J. T. Burhans, undertaker and deputy coroner, and the body was removed by him to his funeral home at Dunbar. Decedent lived in squalor and his household goods and furnishings were not regarded as of any substantial value. From information received by Miss Soxman during decedent's lifetime, she was satisfied that he possessed money and advised the deputy coroner to make a thorough search of the home and its contents. A search was so made on the day following the death, but no money was found. Although no administrator had yet been appointed, it was deemed advisable for the protection of the health of the community that practically all of the household goods and furnishings be burned. It was thought that there might be some articles of value, and the Salvation Army at Connellsville was notified, and its representative, Alvie John-

son, appeared at the home on the afternoon of January 14, 1942, accompanied by Harry Dull, a drayman. The deputy coroner and numerous other persons were also present. The entire contents of the house, except two stoves and a few other articles later taken away by the drayman, were removed and placed on a pile or piles some distance from the house, preparatory to burning. It is in evidence that the deputy coroner was making a further search for the money. There was at least one mattress which was cut or torn into numerous pieces, but just when this was done does not appear by the evidence. Various persons were milling about the piles of rubbish or trash, as the property is described, when Alvie Johnson picked up a purse containing $30.87, and shortly thereafter, a glove or mitten containing $2,200 in currency. The evidence is in conflict as to the exact spot where the glove or mitten was found. Mr. Burhans says that Mr. Johnson took it from the mattress, but this fact is denied by Mr. Johnson and Mr. Dull. At or about the same spot, Mr. Johnson also found the social security card no. 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 of Simon Zweiblia dated September 19, 1938.

The law is settled that the finder of lost property has a valid claim to it against all the world, except the true owner (Hamaker v. Blanchard, 90 Pa. 377), but mislaid property is not lost in the legal sense. Lost property is that which unwittingly passes out of the possession of the owner and the whereabouts of which he does not at any time thereafter know. Where the owner has involuntarily parted with the possession of property through neglect, carelessness, or inadvertence, it is lost. Mislaid property is that which the owner voluntarily and intentionally places where he can again get it, and then forgets where he placed it. Hidden property is not lost property in the legal sense, since the purpose of concealing it is for safekeeping and it is not an involuntary parting of possession, but where articles are actually dropped in public places or thorough-

fares they are lost in the legal sense. A finder acquires no right of possession of mislaid property. The right of possession as against all except the true owner is in the occupant of the premises where the property is discovered. In Hamaker v. Blanchard, supra, the court states the rule in the following language (p. 379):

"But property is not lost, in the sense of the rule, if it was intentionally laid on a table, counter or other place, by the owner, who forgot to take it away, and in such case the proprietor of the premises is entitled to retain the custody. Whenever the surroundings evidence that the article was deposited in its place, the finder has no right of possession against the owner of the building: McAvoy v. Medina, 11 Allen (Mass.) 548. An article casually dropped is within the rule. Where one went into a shop, and as he was leaving picked up a parcel of bank notes, which was lying on the floor, and immediately showed them to the shopman, it was held that the facts did not warrant the supposition that the notes had been deposited there intentionally, they being manifestly lost by some one, and there was no circumstance in the case to take it out of the general rule of law, that the finder of a lost article is entitled to it as against all persons, except the real owner: Bridges v. Hawkesworth, 7 Eng. Law & Eq. R. 424."

All the facts and circumstances in this case lead very definitely to the conclusion that the money was in the dwelling house occupied by decedent at the time of his death. Whether either the purse or mitten was concealed in the mattress or in any other manner is not material. The fund was not lost in a legal sense. The money was placed in the purse and in the mitten voluntarily and intentionally. They were not dropped in any public place. It is conceivable that the money might have belonged to Simon, but there is no evidence of it. The fact that his social security card was found at about the same spot is not sufficient to prove that fact.

Simon had not resided in this dwelling for about eighteen months prior to the death of decedent. Even if the fund did actually belong to Simon this would not strengthen the claim of Alvie Johnson or any other person to it. If the money belonged to decedent, as we think it did, it is clear that he deceived the Department of Public Assistance and other creditors. There is evidence indicating that he feared being taken to the county home and it could have been that he was attempting to guard against such an eventuality.

If the money was mislaid, or even if it had been lost in a legal sense, the finder has no lien against it unless a reward has been offered. No part of the fund can legally be awarded to the finder or to the person who may have had knowledge that the decedent possessed the same. It may be a gracious act for the owner of mislaid or lost property to reward the finder, but he is under no legal obligation to do so. The true owner of property is entitled to possession of it. It is clear that the fund here accounted for belonged to decedent and that it is liable for the payment of his debts and obligations. . . .

It has not been determined whether or not decedent was a citizen of the United States. No witness called had any knowledge of this matter. Since it appears that decedent left no heirs, the residue of the fund will be ordered paid into the State Treasury, through the Department of Revenue, in accordance with section 1314 of article XIII of The Fiscal Code of April 9, 1929, P. L. 343, 72 PS §1314. See also Link's Estate (No. 1), 319 Pa. 513.

### Conclusions of law

First.—The fund here accounted for belonged to decedent, and not to the finder or any other person.

Second.—After the payment of the debts of decedent, costs of administration, and costs of the erection of a marker at the grave of decedent, the balance of the

fund should be paid into the State Treasury, through the Department of Revenue.