G. W. HARDY and TOM DEMOS, JR., Executors of
the Estate of Tom Demos, Deceased,

Plaintiffs and Respondents,

vs.

EUGENE POTTER,

Defendant and Appellant.

(No. 2518; October 23rd, 1951; 236 Pac. (2d) 525)

For the defendant and appellant the cause was submitted upon the brief of R. G. Diefenderfer of Sheridan, Wyoming.

For the plaintiffs and respondents the cause was submitted upon the brief of A. W. Lonabaugh, of Sheridan, Wyoming.

## OPINION

RINER, Justice.

The District Court of Campbell County entered its judgment in favor of the plaintiffs in an action wherein G. W. Hardy and Tom Demos, Jr., executors of the estate of Tom Demos, deceased, sued one Eugene Potter as defendant in said court. The defendant has brought the record in the case here for review.

The pleadings of the parties are brief but they furnish a reasonably clear recital of the matters involved and which the trial court adjudicated.

The petition of the plaintiffs was in substance as follows: Its first paragraph states that plaintiffs on or about June 21, 1948 were appointed executors of the estate of Tom Demos, qualified as such and are now so acting.

Paragraph 2 alleges that Demos died May 17, 1948 at Lafayette Parish, Louisiana, at that time, however, being a resident of Campbell County, Wyoming, and leaving estate in said county; that for more than a year prior to his decease said Demos became totally incompetent so that he could not properly care for his property, and as a consequence a guardian had to be appointed to look after it.

Paragraph 3 avers that deceased, during his lifetime, was accustomed to have on his person and about his premises various sums of cash and currency in large and small amounts; that plaintiffs upon their appointment made a careful search of all of said premises but found no money except as hereinafter stated.

Paragraph 4 alleges that in the course of administer-

ing said estate plaintiff sold to the defendant certain premises which were then precisely described and which were then precisely described and which were stated to be located in the City of Gillette in said County together with all of the improvements situate thereon. These premises were the home and residence of Demos during his lifetime.

It is stated in the fifth paragraph of the pleading that shortly after the defendant's purchase of said premises, the exact date not being known to plaintiffs, the defendant found in said premises a certain sum or sums of money and currency which had been secreted and misplaced by Demos during his lifetime and the location thereof inadvertently forgotten by reason of his mental condition; plaintiffs aver also that this money was the property of Demos and the plaintiffs as executors of his estate are entitled to it and that it should be included as a part of the estate property.

The sixth paragraph states that on or about November 7th, 1949, plaintiffs duly notified the defendant of their claim of ownership of said money, a copy of the notice which made such demand on the defendant being attached to and made a part of the petition as Exhibit "A".

The seventh paragraph alleges the defendant's refusal to deliver the money aforesaid to plaintiffs and wrongfully retains same in his possession.

The prayer of the petition is for a judgment against the defendant that this money thus found by him is the property of the plaintiffs as executors of the Demos estate, that said money be delivered to plaintiffs for the purpose of administering same in the estate of said decedent and that plaintiffs recover their costs as expended herein.

Certain interrogatories were attached also to the petition which plaintiffs asked that the trial court require defendant to answer under oath; however, as the court did not require them to be answered by the defendant and no cognizable complaint is made from its action in so doing, we need not review them here.

Defendant demurred to plaintiff's petition and also the aforesaid interrogatories as insufficient to constitute a cause of action against him. This demurrer was, after argument by order of the court overruled, and defendant given a fixed time in which to file an answer to the plaintiff's pleading.

The defendant, within the time allowed, duly filed his answer which consisted of a general denial of each and all the allegations in plaintiff's pleading. On the issues thus raised a trial was had to the court without a jury with the result above indicated.

The judgment of which complaint is made found generall yfor plaintiffs and against defendant upon all the issues submitted and that plaintiffs were entitled to judgment against the defendant for $3,510 and costs. Judgment in accord with these findings was duly entered and the defendant, dissatisfied, saved his exception thereto.

The testimony is very little in dispute and may be set forth substantially as follows.

In the year 1930 Tom Demos, the father of Tom Demos, Jr., who is one of the executors of his father's estate and one of the plaintiffs in the district court aforesaid, purchased Lot Three of Block Five First Addition to the Town, now City of Gillette, Campbell County, Wyoming, together with all improvements situate thereon. This description is set forth in paragraph No. 4 in plaintiff's petition as hereinabove recited. Tom

Demos, Sr., with his family, which consisted of his wife and two children, Tom, Jr., and Connie his daughter, lived in the house situate on this property as it was one of the improvements thereon until about the month of December in the year 1945 when the wife lost her life in an automobile accident. In that accident Tom, Sr., was also severely injured to such an extent that he was obliged to go to a hospital for care and medical treatment. The father was a good businessman and his estate inventorie dsomething over $50,000. After his wife's death he soon became mentally disturbed which condition gradually grew worse until shortly before his death a guardian had to be appointed to look after his affairs. Demos died in the month of May 1948.

After the death of his wife the father and the two children continued to reside in the home until Connie married a man named Petsoff in April 1947. Sometime after that the father was taken to Louisiana where his daughter an dher husband resided. Meanwhile the son, Tom, Jr., and his wife lived in the old home for some considerable time. His father owned and conducted a restaurant or cafe in Sheridan, where the family lived before moving to Gillette, in which place he also appears to have engaged in the same business. The father made some changes in the home in either the year 1938 or 1939. He had a new part dug and added to the house basement as it existed when he purchased the property. At the same time he appears to have had an addition made to the back porch of the home whose dimensions do not clearly appear in the record.

There is undisputed testimony in the record that Tom, Sr., had a habit of leaving and hiding money in the family home which came into his hands as a result of operating the business aforesaid. After his wife's death he became very forgetful. It seems that while Demos, Sr., possessed an aversion to banks—having in

time past lost money in institutions of that character in two or three cities located in different states, nevertheless he did maintain a deposit box in a bank either in Sheridan or Gillette. On this matter the record is not altogether clear. Notwithstanding that fact he would take money and securities from this deposit box, bring them home and secret them there and then forget about them. His son testifying for the plaintiffs told of finding some $14,000 in U. S. bonds hidden between two blankets in the home. These were found only after an extended search had been made and because they were needed to enable the executors of the Demos estate to make due settlement thereof. The same witness also stated that in August 1946 he found some $4,000 in bills when he was cleaning up the back porch. This money was found behind toys and boxes stored there.

Tom, Jr., took the money and gave it to his father. The latter, instead of putting it in the bank or deposit box, placed it in a table drawer where the son again found it a second time and a second time returned it to his father who took charge of it. After that Tom, Jr., said he never saw it again. He also said that the money was not found to be in the bank or the safety deposit box aforesaid.

Demos, Sr., gave up operating the Stockmen's Cafe business in 1946 or 1947 in Gillette and his son took charge of it and ran it for some time. After the father's death it was sold about June 10, 1948. The home property was also sold by his executors. They sold this property at an auction sale and one Eugene Potter, the defendant herein in the district court and appellant here became the purchaser.

While undertaking to put in a gas heater on October 19 in the year 1949, Potter endeavored to run some copper pipe from the old part of the basement of the house

he had purchased to the new part. That pipe, as he found would extend or reach to the place where he desired to use it only by putting it through a hole over the division wall between the old and new parts of the basement and next to the joists of the floor above. In the course of this work he saw a small box on top of the partition wall between the old and new additions to the basement. This box, a paste board one, was covered with dust and had evidently been there for some considerable time as Potter himself testified.

Upon taking this box upstairs he opened it in the presence of his wife and a considerable sum of money in bills consisting of hundreds, fifties and twenties was found. They were in the new small size currency. Practically all of them had evidently been in circulation at some time judging by their wrinkled and soiled appearance. After discovering this money these bills were taken by Potter immediately to a lawyer, who counted them, and found that the money thus discovered amounted to the sum of $3,510. The lawyer testifying in regard to this matter stated most of these bills were of the series of the year 1934, that 3 or 4 or 5 of them were of the year 1936 series and that there were none later than the issues of that year.

After finding this money Potter placed an advertisement in the local newspaper issue of October 20, 1949, reading as follows:

"FOUND—A large sum of money. Anyone desiring to claim ownership must make it known on or before November 18, 30 days after money was found. Must know serial numbers and denominations. Eugene Potter."

After this notice appeared in the newspaper and on November 7, 1949, the following "Notice and Demand" was served on Potter by the Undersheriff of Campbell County, at the direction of the executors of the Demos estate. That "Notice and Demand" being as follows:

"NOTICE AND DEMAND

TO EUGENE POTTER

Gillette, Wyoming.

YOU ARE HEREBY NOTIFIED that the undersigned Executors of the Estate of Tom Demos, deceased, hereby make claim for any and all sums of money, and in particular the sum of approximately Four Thousand ($4,000.00) Dollars, found by you upon the premises purchased by you, described as follows, to-wit:

Lot Three (3), Block Five (5), First Addition to the Town, now City of Gillette, Campbell County, Wyoming, together with all improvements situate thereon, from the Estate of Tom Demos, deceased

YOU ARE FURTHER NOTIFIED that you are not to destroy or change any of said funds or the container in which same were found and that the undersigned require advice as to the exact amount of any sum and/or sums of said currency so found by you, and if said funds are not delivered to the undersigned within five (5) days from receipt of this notice, suit will be commenced against you in the District Court of Campbell County, Wyoming, for the recovery thereof.

/s/ Tom Demos, Jr., by A. W. L.
/s/ G. W. Hardy
Executors of the Estate of Tom Demos, Deceased."

There was testimony to the effect that several people had rented rooms in the Demos home and used them for some considerable time. These folks had access to the basement of the Demos house and did their laundry work there. However, no one other than the defendant and the executors of the Demos estate has made claim to the money discovered as above described, so far as

the record before us discloses. The defendant, Potter, himself disclaimed having ever put any money in the basement of this house. Only an extremely small part of the paste board box in which the money was found appears as an exhibit in the case. What became of the remainder of it is not clear.

Among the important facts especially to be kept in mind from the foregoing outline of the evidence in the case as well as some additional items gleaned from the oral testimony presented to the court are to be noted the following: Tom Demos, Sr., bought the house where the money was found in the year 1930. He and his family lived there until sometime in 1947, even after his wife's death in December 1945. In 1938 or 1939 he made some changes in the house basement by having a new portion dug and added to the old portion. A concrete wall divided the two portions of the basement which supported the first floor joists. No one except the Demos family had access to these portions of the basement during the years they occupied the house. While it is true that some tenants, unrelated to the family, used the basement occasionally, yet the executors of the Demos estate are the only persons making claim to the money found other than the defendant. This money when found was taken from its location atop the dividin gwall aforesaid and next to the floor joist by Potter while he was working in the new part of the basement. It appears that Demos had an aversion to putting money into an open account in banks as he had in times past lost money in them by so doing. He had a habit of bringing money and valuable securities home from his place of business or from the bank deposit box and secreting them in different locations in the home. Then he would forget where he had placed this property. Especially was this the case after his wife's death. The money found was evidently all in currency which had

been in circulation prior to or during the year 1936. His son testified to having found the sum of $4,000 in bills which his father owned in the year 1946 and though he twice returned the bills to his parent they were again mislaid and never afterwards discovered unless they became a part of the money subsequently found by Potter in the total sum of $3,510. It seems that the money found by the latter was in good condition and mostly in bills of large denominations, such as hundreds, fifties and twenties. This was true also of the $4,000 found by Demos, Jr., and several times returned to his father as above mentioned. The Demos house was sold at auction in 1948. Neither the executors of the Demos estate nor Potter knew at the time of the sale that the money subsequently found by the latter was in the property thus sold. Under the authorities presently to be reviewed the trial court could, as we think, reasonably find that the money thus discovered was money hidden in his home by Demos, Sr., and then overlooked or forgotten by him. There seems to be a distinction made by the courts between lost property and mislaid property: 34 Am. Juris. 632 section 3 says that:

"Mislaid property is to be distinguished from lost property in that the former is property which the owner intentionally places where he can again resort to it, and then forgets, while the latter is property which unwittingly passes out of the possession of its owner, the whereabouts of which he does not at any time thereafter know."

36 C.J.S. 769 section 1, concerning the same matter employs this language:

"Goods or chattels are lost in the legal sense of the word only when the possession has been casually and involuntarily parted with, so that the mind has no impress of, and can have no recourse to, the event. A thing voluntarily laid down and forgotten is not lost within the

meaning of the rule giving the finder title to lost property."

Cases from a number of appellate courts are cited by both texts in support of what is thus announced in each. Tested by these rules it would appear that in the case at bar the money found was not "lost" money, but merely mislaid. It was evidently placed where it was found by someone who did so intentionally and not inadvertently.

The real question to be resolved here is whether the facts and circumstances proven as recited above are sufficient to enable the trial court to find ownership of the property thus discovered in the plaintiffs' testator as claimed by them. In the light of the authorities presently to be examined we are inclined to think that they were sufficient to enable the district court of Campbell County to so find as against the defendant who has no right other than as the finder of the money.

In Huthmacher v. Harris's Administrators, 38 Pa. State 491, Am. Dec. 80, 502, it seems the case involved certain money and valuables which the defendant in the trial court had found in a so-called "drill-machine" which he purchased at a sale held by the administrators of Harris. As soon as the property was found the defendant gave notice of his discovery and a friendly action was instituted to determine who was entitled to retain the property . In affirming a judgment in favor of the administrators rendered by the trial court the reviewing court said:

"Sale, said Mr. Justice Wayne, in Williamson v. Berry, 8 How. 544, is a word of precise legal import, both at law and in equity. It means at all times a contract between parties to pass rights of property for money which the buyer pays, or promises to pay, to the seller for the thing bought and sold.

"That no such contract was made by these parties in respect to the contents of the drill machine, we deduce

from the agreed facts of the case. The machine itself, and every essential part and constituent element of it, were well sold. The consideration paid, though only fifteen cents, was in law a quid pro quo, and the sale, unaffected by fraud or misrepresentation, passed to the purchaser an indefeasible right to the machine and all the uses and purposes to which it could be applied. But the contents of the machine are to be distinguished from its constituent parts. They were unknown to the administrators, were not inventoried, were not exposed to auction, were not sold. Of course they were not bought. All that was sold was fairly bought, and may be held by the purchasers. The title to what was not sold remains unchanged. A sale of a coat does not give title to the pocket-book which may happen to be temporarily deposited in it, nor the sale of a chest of drawers a title to the deposits therein. In these cases, and many others that are easily imagined, the contents are not essential to the existence or usefulness of the thing contracted for, and not being within the contemplation or intention of the contracting parties, do not pass by the sale. The contract of sale, like all other contracts, is to be controlled by the clearly ascertained intention of the parties."

In Surmach's Estate 47 Pa. D. & C. 483, 485, it appeared that following the death of one who lived alone in abject poverty and under unsanitary conditions the contents of his house were removed to a pile not far therefrom preparatory to burning them. A fruitless search having been made in the meantime by the Coroner, who had been advised by others that there might be money found in the house. A representative of the Salvation Army, one Alvie Johnson, found a purse containing $30.87 and soon thereafter a glove or mitten containing $2200 in currency. It was disputed as to the exact spot where the glove or mitten was found whether in a mattress owned by the deceased or elsewhere in the pile of stuff taken from the home for burning. Near where the glove or mitten was found was also discovered the Social Security card of one Simon Zwei-

blia who also lived in the same house but in a separate home and apart from the deceased. In holding the discovered funds for the payment of the decedent's debts the court said that:

"The law is settled that the finder of lost property has a valid claim to it against all the world, except the true owner (Hamaker v. Blanchard, 90 Pa. 377), but mislaid property is not lost in the legal sense. Lost property is that which unwittingly passes out of the possession of the owner and the whereabouts of which he does not at any time thereafter know. Where the owner has involuntarily parted with the possession of property through neglect, carelessness, or inadvertence, it is lost. Mislaid property is that which the owner voluntarily and intentionally places where he can again get it, and then forgets where he placed it. Hidden property is not lost property in the legal sense, since the purpose of concealing it is for safekeeping and it is not an involuntary parting of possession, but where articles are actually dropped in public places or thoroughfares they are lost in the legal sense. A finder acquires no right of possession of mislaid property. * * *

"All the facts and circumstances in this case lead very definitely to the conclusion that the money was in the dwelling house occupied by decedent at the time of his death. Whether either the purse or mitten was concealed in the mattress or in any other manner is not material. The fund was not lost in a legal sense. The money was placed in the purse and in the mitten voluntarily and intentionally. They were not dropped in any public place. It is conceivable that the money might have belonged to Simon, but there is no evidence of it. The fact that his social security card was found at about the same spot is not sufficient to prove that fact. "Simon had not resided in this dwelling for about eighteen months prior to the death of decedent. Even if the fund did actually belong to Simon this would not strengthen the claim of Alvie Johnson, or any other person to it. If the money belonged to decedent, as we think it did, it is clair that he deceived the Department of Public Assistance and other creditors. There is evidence indicating that he feared being taken to the

county home and it could have been that he was attempting to guard against such an eventuality.

"If the money was mislaid, or even if it had been lost in a legal sense, the finder has no lien against it unless a reward has been offered. No part of the fund can legally be awarded to the finder or to the person who may have had knowledge that the decedent possessed the same. It may be a gracious act for the owner of mislaid or lost property to reward the finder, but he is under no legal obligation to do so. The true owner of property is entitled to possession of it. It is clear that the fund here accounted for belonged to decedent and that it is liable for the payment of his debts and obligations."

The English law concerning matters of this character would also seem to be as pointed out by the authorities reviewed above. In 1 Halsbury's Laws of England, 2d Ed. 731, under the subject of bailment it is said:

"So, if a person purchase a chattel, such as a writing desk or bureau, and subsequently to the purchase find concealed therein some article the existence of which was unknown to both buyer and seller at the time of the purchase, the property in that article will, apart from special circumstances such as the proved intention of the parties to sell and buy the chattel and its contents, known and unknown, remain in the seller of the chattel and will not pass to the buyer, who will become a mere depositary of the article, and may be guilty of larceny if he appropriates it to himself, though as regards criminal liability, an important factor in determining the question is the honest belief of the purchaser as to what was to be conveyed to him at the time of the bargain."

In Merry v. Green, 7 M. & W. 623 the facts were that a person purchased at a public auction a secretary or bureau in which he afterwards discovered in a secret drawer a purse containing money which he appropriated to his own use. At the time of the sale it was not known that the bureau contained anything whatever. There was testimony however that the auctioneer said

when it was pointed out after the sale that one of the drawers would not open "so much the better for the buyer;" adding "I have sold it with its contents and it is his;" but the auctioneer himself testified that what he really said was "That is of no consequence, I have sold the secretary and not its contents." The Judge who tried the case told the jury that as the property had been delivered to the plaintiff as the purchaser he thought there had been no felonious taking and left to them the question of damages only; reserving leave for the defendant to move to enter a nonsuit. The jury found a verdict for the plaintiff with 50 pounds damages. Baron Parke speaking for the reviewing court in ordering a new trial said in the course of his opinion:

"It was contended that there was a delivery of the secretary, and the money in it, to the plaintiff as his own property, which gave him a lawful possession, and that his subsequent misappropriation did not constitute a felony. But it seems to us, that though there was a delivery of the secretary, and a lawful property in it thereby vested in the plaintiff, there was no delivery so as to give a lawful possession of the purse and money. The vendor had no intention to deliver it, nor the vendee to receive it, both were ignorant of its existence: and when the plaintiff discovered that there was a secret drawer containing the purse and money it was a simple case of finding and the law applicable to all cases of finding applies to this.

"The old rule (3 Inst. 108), that 'if one lose his goods and another find them, though he convert them animo furandi to his own use, it is no larceny,' has undergone in more recent times some limitations; one is, that if the finder knows who the owner of the lost chattel is, or if, from any mark upon it, or the circumstances under which it is found, the owner could be reasonably ascertained, then the fraudulent conversion, animo furandi, constitutes a larceny (Russell on Crimes, 102). Under this head fall the cases where the finder of a pocketbook with bank-notes in it, with a name on them, converts them animo furandi; or a hackney coachman, who

abstracts the contents of a parcel which has been left in his coach by a passenger (Wynne's case, Leach, C. C. 413; 2 East, P. C. 664), whom he could easily ascertain; or a tailor who finds, and applies to his own use a pocket-book in a coat sent to him to repair by a customer, whom he must know (Sartwright v. Green, 8 Ves. 405) ; all these have been held to be cases of larceny; and the present is an instance of the same kind, and not distinguishable from them. It is said that the offence cannot be larceny, unless the taking would be a trespass, and that is true; but if the finder, from the circumstances of the case, must have known who was the owner, and instead of keeping the chattel for him, means from the first to appropriate it to his own use, he does not acquire it by a rightful title, and the true owner might maintain trespass; and it seems also from Wynne's case, that if, under like circumstances, he acquire possession, and mean to act honestly, but afterwards alter his mind, and open the parcel with intent to embezzle its contents, such unlawful act would render him guilty of larceny."

In Kuykendall v. Fisher 61 W. Va. 87, 56 S.E. 48, the pertinent facts as taken from the opinion of the court were:

"A writ of error to the circuit court of Mineral County has brought here for review a judgment in favor of Edward Kuykendall, an infant, suing by his next friend, against Harry C. Fisher, as administrator of the estate of Ellen Hughes, deceased, rendered by that court on an appeal from a judgment of a justice of the peace, in whose court the action originated. As the rulings complained of relate to the rejection of evidence offered and instructions given and refused, a statement of the principal facts and the nature of the case with reference to some of the evidence is necessary.

"Fisher, as administrator of Ellen Hughes, sold to one Pierce Helmick, among other household articles, a heating stove. Some time afterwards the plaintiff, Edward Kuykendall, a boy about 13 years old, while playing about the premises of Helmick, discovered in the stove a small tobacco sack containing a considerable amount of money in gold, and wrapped in a cloth. Not knowing

its value, he gave some of it away, and probably lost a portion of it. He gave to Chas. Beemas, another boy, $10.00, who handed it to Mrs. Helmick, and to a boy named Jackson Mayhew $2.50, and on returning home his mother took from him what he had left, amounting to $145. This she took to Fisher, the administrator, and delivered it to him. Thereupon Fisher demanded and received from Mrs. Helmick what she had received, and from the Mayhew boy what he had received, and advertised the fact of the loss of a portion of the money, but was unable to recover any more."

The following excerpt from the latter part of the opinion discloses the court's views in ordering a new trial, language being used as follows:

"These conclusions lead to the question of ownership in the defendant's decedent as the only issue in the case. The loss or concealment and the finding are uncontroverted facts. Nothing is denied except the assertion of title in the defendant. All the evidence bearing on that question is favorable to him. The money was found in a stove, which his decedent had owned and used, and which had been but recently removed from her premises. She had been a woman of sufficient means to enable her to possess the amount of money found in it, and she had, only a short time before her death, possessed a small precious package similar to the one found, and which, tested by its weight and the sense of touch, seemed to contain coin-gold, a witness says. The man in whose possession the stove was, a witness in the case, does not claim that he or any member of his family placed the package in it, or knows how it came to be there. The case made by the defendant on the issue is unopposed by anything except the bare possibility that some person other than the decedent may have placed it there, and the slight circumstances that Helmick poured some ashes out of the stove before removing it, and left it in the alley a week before putting it in his outbuilding—facts, if they be so, not necessarily inconsistent with the conclusion to which the evidence directly tends. The boy says the package 'was lying right on top of the ashes.' Fisher says that when he looked in the stove, after the finding of the money, 'the ashes were drawn forward in the base of the stove.' All

this evidence may stand together without the slightest difficulty. Helmick may have poured out part of the ashes, and thus caused the package to roll to the top of the residue, where the boy found it. Thus the evidence for the plaintiff does not tend to sustain his side of the issue in an appreciable degree, and therefore amounts in law to no evidence. In that state of the case no instructions should have been given by the court tending in any degree to impair the weight of the evidence for the defendant."

A case not so strong for the plaintiff as the facts presented in the case at bar is Warren vs. Ulrich 130 Pa. 413, 18 Atl. 618. This was a suit by John Warren as administrator of George Warren, deceased, to recover certain money. George Warren plaintiff's testator died in 1879. The family did not live on his estate after his death. During his lifetime he kept a tavern for many years. After his death the tavern was operated by one James Neely; then by one Dale Kuhn for some four years, and from that time on by the defendant, Ulrich. About December 1st, 1887, one Dennis, who had been employed by the defendant to clean an outbuilding on the premises while engaged in this work found a roll of money totalling $320. Dennis sold the money thus discovered to one John Caldwell for $50 in gold. Caldwell left the bills which had been found with Ulrich for safe-keeping, or as he said, "until somebody proved it and gave him $50." When John Warren learned of the discovery of the money he took out letters of administration with the will annexed on his father's estate and instituted this suit alleging that the money found amounted to about $1800 and had belonged to his father. On the trial of the action plaintiff showed that the decedent was a man of some means, that he had some perculiarities about his money, on one occasion hiding about $1000 in a cave and in the garden; that he did not deposit in the banks. The bills were all of a date prior to the testator's death. There was no

evidence at all that decedent had ever lost any money. The jury found for the plaintiff in the sum of $320 and judgment was entered thereon. Thereafter the defendant brought appeal proceedings.

The Supreme Court of Pennsylvania filed the following opinion affirming the judgment, which opinion in its entirety reads:

"PER CURIAM. The evidence was undoubtedly weak to prove the ownership of this money. There was no positive proof bearing upon this question; but there was a chain of circumstances clearly proved, and not disputed, which render it extremely probable that the money in question had been buried, where it was found, by George Warren, the former owner or occupier of the property. Had it been found while he remained upon the property, the case would have been much clearer; but it was not found until after his death, and after the premises had been occupied by other tenants for some years. Neither of them claim it, however; and in view of Warren's aversion to banks, and his known way of hiding and secreting his money, we are not surprised that the jury found him to have been the owner of it. It is true, the finder of money has title to it against all the world except the true owner; yet we cannot say there was not evidence of Warren's title to submit to the jury; and their verdict is in accordance with all the probabilities of the case. Judgment affirmed."

We have examined with care the brief and authorities cited by appellant. We do not regard them as in point or of assistance in disposing of this matter correctly. The action brought was for the money discovered and stated very fully the facts and circumstances disclosed subsequently by the evidence as we have seen. (Sec. 3-1301 W.C.S. 1945).

Consequently, under the circumstances presented by the record here and as between the parties to this action we are of the opinion that the trial court could reasonably conclude that the money discovered by the de-

fendant in the home previously occupied by the Demos family was the money of Demos, Sr.; that he placed it on top of the wall where it was found and had then forgotten about it. We can see no good reason why it should not be turned over to the personal representatives of his estate, plaintiff's herein, to respond to all legal demands on that estate as the law directs. The judgment of the trial court should, as we think, be affirmed.

*Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.